**MAGMA POWER COMPANY,**
**Plaintiff–Appellant,**

v.

**The DOW CHEMICAL COMPANY,**
**Defendant–Appellee.**

**No. 545, Docket 97–7407.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 16, 1997.

Decided Feb. 9, 1998.

318

Jeanne M. Luboja, New York City (Joanne M. Chormanski, Michael McIlwrath, Willkie Farr & Gallagher, on the brief), for Plaintiff–Appellant.

Jonathan C. Medow, New York City (Bennett W. Lasko, Richard A. Spehr, Mayer, Brown & Spehr, on the brief), for Defendant–Appellee.

Before: JACOBS and LEVAL, Circuit Judges and RESTANI, Judge.*

JACOBS, Circuit Judge.

Magma Power Company ("Magma") sues under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) ("Section 16(b)"), to capture short-swing profits allegedly earned on trading in Magma stock by The Dow Chemical Co. ("Dow"), which was a statutory insider at the relevant times. The task of matching transactions for the purpose of detecting profits subject to disgorgement under Section 16(b) is ordinarily mechanical; here, because the underlying transactions include a derivative security, the analysis is less straightforward.

At issue are various Dow transactions involving Magma stock. In one transaction, Dow issued subordinated exchangeable Notes with an option in the noteholder to exchange the Notes at any time prior to maturity for a fixed number of Magma shares, i.e., a call equivalent option. The Notes also permitted Dow to satisfy an exchange demand by paying the market price of those shares as of the exercise date rather than delivering the shares themselves. In November and December 1994, many noteholders tendered their Notes in exchange for

* Hon. Jane A. Restani, of the United States Court of International Trade, sitting by designation.

Magma shares. Dow delivered Magma shares rather than their purchase price. The other set of transactions—an accounting-driven sale of Magma shares with an option in Dow to re-purchase the same shares at the same price—took place in September, 1994. That was more than six months after the issuance of the subordinated exchangeable Notes, and within six months before the time that Dow elected to satisfy the noteholders' exchange demands in stock rather than cash. Magma alleges that for Section 16(b) purposes, Dow's election to satisfy the exchange demands by transfer of Magma stock in the one transaction amounted to a sale that should be matched against Dow's purchase (within six months) of the option to re-purchase Magma shares in the other transaction.

The United States District Court for the Southern District of New York (Keenan, J.) granted judgment on the pleadings in favor of Dow. We affirm.

### BACKGROUND

At all pertinent times, Dow owned at least 10% of the common stock of Magma and was the largest minority shareholder.

#### A. The Issuance of the Notes.

In April 1991, Dow sold to the public $150 million in subordinated exchangeable Notes, which were exchangeable at any time prior to maturity (in the year 2001), at the noteholder's option, for a fixed number of shares of Magma (the "Notes"). Under the terms of the Indenture, each $1000 Note was exchangeable for 26–2/3 Magma shares, meaning that each noteholder had an option to acquire Magma stock at the fixed price of $37.50 per share ($1000 divided by 26–2/3 shares). Simultaneously with the issuance of the Notes, Dow deposited approximately 4,000,000 shares of Magma stock into escrow ($150 million divided by $37.50). In the event of an exchange, the Indenture afforded Dow the option of paying the noteholders (in lieu of the shares) cash equal to the market value of the 26–2/3 shares on the date that the escrow agent received the noteholder's notice of exchange. In other words, to the

extent that Dow is viewed as having sold Magma stock when it issued the Notes exchangeable into Magma shares, it might be viewed as having retained the option of reacquiring the shares that were subject to the exchange by paying the noteholders the market price prevailing at the time of exchange.[1]

#### B. The Garantia Option: Purchase and Sale.

On September 12, 1994—in an unrelated transaction—Dow sold 857,143 shares of Magma common stock to Garantia Banking Limited at the then-current market price of $28.25 per share; Dow simultaneously purchased from Garantia (for $150,000) an option to reacquire those same shares at the same price ("the Garantia Option"). Within three weeks, on September 30, 1994, Dow exercised its option and reacquired the 857,143 shares. This maneuver was apparently undertaken in order to reconcile a mismatch between the book basis and tax basis for these shares.

#### C. The Exchange of the Notes.

The value of the noteholders' exchange rights rose with the share price of Magma stock. In late 1994, California Energy Company, Inc., n/k/a CalEnergy Company, Inc. ("California Energy"), made an unsolicited tender offer for Magma shares at $38.50 per share—one dollar above the fixed per-share exchange price. Between November 21, 1994 and December 29, 1994, many holders of the Notes reacted by serving demands of exchange pursuant to their option to exchange the Notes for the (appreciated) Magma shares. In response, Dow delivered 882,259 shares of Magma to tendering noteholders. It did not exercise its option to retain the Magma stock and pay its market value to the tendering noteholders. It is these transactions that Magma seeks to match against Dow's purchase pursuant to the Garantia Option; therefore, Magma is entitled to a recovery under Section 16(b) only if it can demonstrate that these transac-

---

1. Magma has coined the term "embedded option" to describe Dow's right to satisfy the ex-
change via cash rather than stock; it is not a term of art in law or finance.

tions constituted a sale within the meaning of the statute.

### D. The Take–Over of Magma.

Through its tender offer, California Energy succeeded in acquiring a controlling interest in Magma. On February 24, 1995, California Energy completed its takeover by merging Magma into a wholly-owned subsidiary of California Energy. The merger extinguished all minority interests in Magma, including Dow's. The merger terms obligated Magma (as wholly owned subsidiary of California Energy) to compensate Dow for its minority interest. Magma sought to avoid the multi-million dollar payment, however, on the ground that Dow owed Magma a disgorgement under Section 16(b), and Magma unilaterally proceeded to "withhold and segregate in a separate escrow account that portion of the cash merger consideration which constitutes the ... 'short-swing' profits." Magma's Complaint for Declaratory Relief and Damages, at ¶ 10.

### E. The Litigation.

Magma thereafter sued Dow, seeking a declaration endorsing its interpretation of Section 16(b), and Dow counterclaimed for the escrowed funds. Magma later released the funds, and the parties stipulated to a dismissal of Dow's counterclaim and to the recasting of Magma's claim for declaratory relief as a claim for money damages. Magma moved for partial summary judgment on its first cause of action, which sets forth the theory of liability that forms the subject of this appeal; Dow cross-moved for judgment on the pleadings.

On January 21, 1997, the district court entered an order denying Magma's motion and granting judgment on the pleadings in favor of Dow. Recognizing that further amendment could not cure the defects in Magma's complaint, the district court dismissed the first cause of action with prejudice. Following the parties' stipulation to dismissal with prejudice of the remaining causes of action, the district court entered final judgment in Dow's favor on March 3, 1997. We affirm on some of the same grounds adopted by the district court.

## DISCUSSION

### A. Section 16(b).

As a "beneficial owner" of more than ten percent of the common stock of Magma, *see* 15 U.S.C. § 78p(a) (1994), Dow was an insider subject to Section 16(b) of the Exchange Act:

> For the purpose of preventing the unfair use of information which may have been obtained by *such beneficial owner*, director, or officer by reason of his relationship to the issuer, *any profit realized* by him from any purchase and sale, or *any sale and purchase*, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be *recoverable by the issuer*, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months.

15 U.S.C. § 78p(b) (1994) (emphasis added). Section 16(b) thus compels statutory insiders to disgorge profits earned on any purchase and sale (or sale and purchase) made within six months of each other. Congress intended this strict liability provision to remove any temptation for insiders to engage in transactions which "may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information." *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 594, 93 S.Ct. 1736, 1744, 36 L.Ed.2d 503 (1973).

■ No showing of actual misuse of inside information or of unlawful intent is necessary to compel disgorgement. *See Foremost–McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 251, 96 S.Ct. 508, 519, 46 L.Ed.2d 464 (1976); *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 424 n. 4, 92 S.Ct. 596, 600 n. 4, 30 L.Ed.2d 575 (1972). Section 16(b) operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt

insiders who skirt the letter of the prohibition. "Such is the price of easy administration." Robert Charles Clark, *Corporate Law* 295–96 (1986). Congress believed that such a blunt instrument was the only way to control insider trading:

> [T]he only remedy which [Section 16(b)'s] framers deemed effective for this reform was the imposition of a liability based upon an objective measure of proof.... "You hold the director, irrespective of any intention or expectation to sell the security within six months after, because it will be absolutely impossible to prove the existence of such intention or expectation, and you have to have this crude rule of thumb, because you cannot undertake the burden of having to prove that the director intended, at the time he bought, to get out on a short swing."

*Smolowe v. Delendo Corp.*, 136 F.2d 231, 235–36 (2d Cir.1943) (quoting Rep. Corcoran, chief spokesman for the drafters and proponents of the Act). "In short, this statute imposes liability without fault [but only] within its narrowly drawn limits." *Foremost–McKesson*, 423 U.S. at 251, 96 S.Ct. at 519.

### B. The Application of Section 16(b) to Derivative Securities.

One feature of the Notes is functionally the equivalent of a call option in the noteholder, the value of which is pegged to the price of Magma stock; the Notes are therefore derivative securities, *i.e.*, financial instruments that derive their value (hence the name) from an underlying security or index. In 1991, the SEC adopted comprehensive amendments to its rules and forms under Section 16(b) in order to clear up uncertainties as to how that section applies to derivative securities, including options.[2] *See* Ownership Reports and Trading by Officers,

Directors and Principal Security Holders, Exchange Act Release No. 28,869, [1990–1991 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 84,709, at 81,258 (Feb. 8, 1991) ("Release No. 28869"). The amendments reflect the SEC's "recogni[tion] that holding derivative securities is functionally equivalent to holding the underlying equity securities for purposes of Section 16, since the value of the derivative securities is a function of or related to the value of the underlying equity security." *Id.* The SEC was concerned that unless this functional equivalence were recognized and accounted for, insiders could "evade disgorgement of short-swing profits simply by buying call options and selling the underlying stock, or buying underlying stock and buying put options." *Id.*

Rule 16a–1(c), as revised, defines "derivative securities" as "any option, warrant, convertible security, stock appreciation right, or similar right with an exercise or conversion privilege at a price related to an equity security, or similar securities with a value derived from the value of an equity security." 17 C.F.R. § 240.16a–1(c) (1997). The definition expressly excludes "[r]ights with an exercise or conversion privilege at a price that is not fixed." 17 C.F.R. § 240.16a–1(c)(6) (1997). The exclusion ends when the exercise or conversion price becomes fixed. *See* Release No. 28869, at 81,265 ("[A] right with a floating exercise price ... will not be deemed to be acquired or purchased, for Section 16 purposes, until the purchase price of the underlying securities becomes fixed or established, which commonly occurs at exercise.").

The equivalence drawn by the SEC between derivative securities and the underlying equity securities is reflected in a parallel revision made by the SEC to its Rule 16b–6, so that the *acquisition* of a fixed-price option—rather than its *exercise*—is the trigger-

---

**2.** An option, the type of derivative at issue here, is a purchased right to buy or sell property at a fixed or floating price. John Downes and John Elliot Goodman, *Dictionary of Financial and Investment Terms* at 390 (1995). If not exercised within the contractually-specified period, an option expires and the buyer of the option loses the acquisition price. A call option gives the option holder the right to buy shares of an underlying security at a particular price; thus, "[a] 'call equivalent position' is a derivative security position that increases in value as the value of the underlying equity increases." 3C Harold S. Bloomenthal and Samuel Wolff, *Securities and Federal Corporate Law* § 10.11 at 10.73 (1997). A put option is the right to sell a security at a specified price; thus, the value of a put option increases as the price of the underlying security falls. "[A] 'put equivalent position,' ... means a derivative security position that increases in value as the value of the underlying equity security decreases." *Id.* at 10.74.

ing event for Section 16(b) purposes. Rule 16b–6(a) provides that

> [t]he establishment of or increase in a call equivalent position [which includes an option to purchase at a fixed price] or liquidation of or decrease in a put equivalent option [which includes an option to sell a security at a fixed price] shall be deemed a purchase of the underlying security for purposes of section 16(b) of the Act, and the establishment of or increase in a put equivalent position or liquidation of or decrease in a call equivalent position shall be deemed a sale of the underlying securities for purposes of section 16(b) of the Act.

17 C.F.R. § 240.16b–6(a) (1997). Under this rule, the acquisition or disposition of a derivative security with a fixed exercise price is treated just as if the insider had traded the underlying security itself. The prophylactic purposes of Section 16(b) are thus served because the "insider's opportunity to profit" by access to nonpublic information "commences ... when the insider engages in options or other derivative securities that provide an opportunity to obtain or dispose of the stock at a fixed price." Release No. 28869, at 81,258. In essence, an insider who takes an option position is making a bet on the future movement of the price of the underlying securities; the odds in the insider's favor are foreshortened if the wager is backed by inside information. Because the acquisition or disposition of the option is the point at which the inside information may be advantageous, the SEC's regime regards it as the triggering event under Section 16(b).

By the same token, the exercise of a fixed-price option is a non-event for 16(b) purposes. Rule 16b–6(b) provides that

> [t]he closing of a derivative security position as a result of its exercise or conversion shall be exempt from the operation of section 16(b) of the Act, and the acquisition of underlying securities at a fixed exercise price due to the exercise or conversion of a call equivalent position or the disposition of underlying securities at a fixed exercise price due to the exercise of a put equivalent position shall be exempt from the operation of section 16(b) of the Act.

17 C.F.R. § 240.16b–6(b) (1997). The SEC thus treats the exercise of a fixed-price option as nothing more than a change from an indirect form of beneficial ownership of the underlying securities to a more direct one; because the insider by then is already bound by the terms of the option, the potential for abuse of inside information is minimal.

One other revised provision is potentially implicated: Rule 16b–6(a) provides that "the fixing of the exercise price of a right initially issued without a fixed price, where the date the price is fixed is not known in advance and is outside the control of the recipient ... shall be exempt from section 16(b) of the Act with respect to any offsetting transaction within the six months prior to the date the price is fixed." 17 C.F.R. § 240.16b–6(a) (1997). This exemption avoids the unfairness of subjecting insiders to liability under Section 16(b) who engage in a purchase or sale and then have an offsetting sale or purchase thrust upon them thereafter by events "not known in advance" and "outside the[ir] control." *Id.; see* Release No. 28869, at 81,265.

## C. The Application of Section 16(b) to the Dow Transactions.

In order to recover any short-swing profits realized by Dow, Magma must prove (1) that Dow was a statutory insider; (2) that Dow made a purchase; and (3) that within six months Dow made an offsetting sale. The first two elements are not in dispute. Dow concedes that it was a statutory insider because as of September 12, 1994, it beneficially owned 20.9% of Magma's outstanding shares and, at all times between September 12 and December 29, 1994, it beneficially owned more than 10% of the outstanding shares.

█ Dow further agrees that its acquisition of the Garantia Option on September 12, 1994 constituted a "purchase" of 857,143 shares of Magma common stock. The Garantia Option came within the definition of a "derivative security" and put Dow in a "call equivalent position" because it gave Dow the right to acquire the Magma shares at the fixed price of $28.25 per share. *See* 17 C.F.R. 240.16a–1(b) and (c). The establishment of a "call equivalent position" consti-

tutes a purchase of the underlying security for purposes of Section 16(b). *See* 17 C.F.R. § 240.16b–6(a). Because Dow had the right to obtain 857,143 shares of Magma at a predetermined price, Dow purchased those shares within the meaning of Section 16(b) when it entered into the option contract on September 12, 1994.

The crucial issue in this appeal relates to the third element of the alleged 16(b) offense—whether Dow sold Magma shares within six months at a profit in a transaction that can be matched against its purchase (through the Garantia option) on September 12, 1994. Magma contends that the transactions in November and December 1994— when Dow delivered Magma shares to its noteholders in exchange for their Notes and declined to exercise its option to pay the market value of the Magma shares instead of delivering them—constituted a sale within six months of the Garantia purchase by which Dow realized an illegal short-swing profit.

Were it not for the feature that gave Dow the option to deliver either Magma stock or its market value in cash—in other words, if the exchangeability feature of the Dow Notes required Dow simply to deliver 26–2/3 shares of Magma stock for every $1000 face amount of Notes—Dow's delivery of the Magma stock obviously would not constitute a sale under Section 16(b). That is because Rule 16b–6(b) provides that "the closing of a derivative security position as a result of its exercise or conversion shall be exempt from the operation of Section 16(b)." 17 C.F.R. § 240.16b–6(b). Instead, it is the "establishment of . . . a put equivalent position . . . [that] shall be deemed a sale of the underlying securities for purposes of Section 16(b)." 17 C.F.R. § 240.16b–6(a). Under these regulations, Dow's delivery of Magma stock would simply close out its put-equivalent position created at the time of the issuance of the exchangeable Notes, and would not constitute a sale under Section 16(b).

██ Magma argues that the option feature permitting Dow to retain the Magma stock and instead pay its noteholders the market

price prevailing at the time of the exchange transforms the exchange with the noteholders into a sale by Dow at a price higher than its Garantia purchase. Magma expresses this argument on appeal in tripartite form: (1) that the Notes must be treated as a single instrument, the sale of which can only occur at a single point in time; (2) that no sale took place in 1991 because the presence of the floating price option retained by Dow took the Notes outside the category of derivative securities; and (3) that the "sale" therefore took place in November and December of 1994 when (after the noteholders exercised their exchange rights) Dow exercised the option to provide the shares instead of cash. According to Magma, Dow had the opportunity to abuse its insider status at this time because Dow could retain the Magma shares if it anticipated a further rise in stock prices or release the shares to converting noteholders if it anticipated that prices were likely to fall. Without adducing authority for its precise position,[3] Magma construes Rule 16b–6 to mean that *all* options arising out of the same instrument must have a fixed exercise price before the creation of any of the constituent options can be deemed a sale. This approach—treating the instrument rather than the component options as the relevant unit for 16(b) purposes—is problematic.

The recent amendments demonstrate the SEC's efforts to foreclose the use of transactions in derivatives as vehicles for evading Section 16(b) liability by avoiding transactions in the underlying equity securities themselves. Adoption of Magma's proposed interpretation would open a wide loophole for insiders who wish to hold onto their short-swing gains. An insider holding recently purchased shares with confidential knowledge of imminent bad news could, under Magma's analysis, obtain a fixed price put option, coupled with an option to satisfy the buyer of the securities by providing, at the insider's sole election, cash equivalent to the market value at the time of exercise, instead of the shares. Under Magma's analysis, the option to deliver cash—even if inserted with

---

**3.** Magma points to a no-action letter issued by the SEC as supportive of its position in an analogous context. *See* Midlantic Corp., SEC No–Action Letter, [1990–1991 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 79,674 (Apr. 19, 1991).

no intent to exercise it, but simply to avoid a sale under 16(b)—means that a subsequent purchase within six months, at a lower price, can lock in a profit (i.e., the difference between the terms of the put option and the purchase price of the shares) that escapes Section 16(b) because no sale is available to match against this purchase. The creation of the put option, in Magma's view, is not a sale because of the presence of the floating price call option. Thus, as long as the insider holds out beyond six months from his last purchase of shares to exercise his put option, he is home free.

No rule is impregnable; but we decline to offer insiders an opportunity to avoid Section 16(b) that poses so little challenge to ingenuity. The better approach is to treat as analytically distinct each option contained in the kind of complex instrument at issue here. Here, the Notes contained two options: a fixed price option granted to the noteholders, and a floating price option retained by Dow that enabled Dow effectively to reacquire the shares in question by paying cash equal to their market value at the time of the exchange. We analyze each component of the instrument in turn.

### 1. The Option Granted to the Noteholders.

■ Dow's issuance of the Notes in 1991 amounted to the "sale" (at that time) of the corresponding shares of Magma. The establishment of a "put equivalent position" is deemed a sale for Section 16(b) purposes under Rule 16b–6(a). The Notes issued in 1991 placed Dow in a "put equivalent position," because Dow's position moved inversely with Magma's stock price: the higher the market price of the stock, the more costly Dow's obligations would be in the event of an exchange demand, and vice versa. If the price of Magma stock rose above $37.50 per share, the noteholders could compel Dow to retire the $1000 Notes with assets worth more than $1,000.

Midlantic Corp., SEC No–Action Letter, [1990–1991 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 79,674 (Apr. 19, 1991), is not to the contrary. The SEC concluded in *Midlantic* that the Notes in question there were not

derivative securities because their conversion price was not fixed. Like the Notes here, the Midlantic Notes were exchangeable for stock or cash, at the issuer's sole discretion. But the instrument in *Midlantic* did not specify in advance the number of shares that each noteholder would receive upon conversion; so the Midlantic option was a genuinely floating option, and as such it was outside the SEC's definition of derivative securities. *See* 17 C.F.R. § 240.16a–1(c)(6) (1997). Here, each $1,000 Note was exchangeable for 26–2/3 shares of Magma stock, so that Dow granted the noteholders a fixed-price option to acquire Magma shares at $37.50 each and, for Section 16(b) purposes, "sold" the shares at that price, as the district court correctly determined, *in 1991*. The noteholders' exercise of their fixed-price options *in 1994* was a non-event for Section 16(b) purposes, *see* 17 C.F.R. § 240.16b–6(b) (1997), because at that time the parties were bound by the contractual terms of the option.

### 2. The Option Retained by Dow.

■ A separate examination of the nature of the option retained by Dow and Dow's actions (or, more accurately, inactivity) pursuant to the terms of that option reveals no basis for the imposition of Section 16(b) liability. No offsetting sale of Magma shares took place within six months of the Garantia transaction.

### (a) The Nature of Dow's Option.

The option that Dow retained for itself when it issued the Notes in 1991 was not an option to sell the shares at a floating price; rather, it was only the right to (as it were) repurchase the shares that it was otherwise obligated to deliver by paying the noteholders *the market price prevailing at the time of receipt of the exchange demand.* Magma emphasizes the (conceded) floating nature of this option; undoubtedly it was a floating price option, but it was a floating price *call* option. In other words, Magma's claim under Section 16(b) mismatches a purchase against a purchase. Putting this purchase at a price exceeding $37.50 per share together with Dow's September purchase at the price of $28.25 per share would not create a liabili-

ty under 16(b), because a pair of purchases are not offsetting transactions within Section 16(b). *See* Clark, *supra*, at 295–95 ("16(b) requires at least *two* transactions within six months: a purchase followed by a sale or a sale followed by. a purchase."); *see also* 15 U.S.C. § 78p(b) (compelling disgorgement of profits from "any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months").

### (b) *The Decision Not to Purchase.*

 Further, Dow in fact never exercised its option to buy back the Magma shares. Magma characterizes the decision by Dow to deliver the shares instead of the cash—*i.e.,* its decision not to exercise its option to repurchase the shares—as a sale. A failure to purchase, however, is not a sale. Were this not the case, virtually every insider transaction could give rise to liability. Every day, an insider has the opportunity to buy shares at the market price. If the foregoing of that opportunity constitutes a sale, then every occasion upon which the market for the stock exceeds the purchase price within six months of an insider purchase, the insider would be deemed to have sold at such higher prices, creating illegal profit. The settled rule is that an insider's inactivity cannot give rise to Section 16(b) liability. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 737–38, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539 (1975) (holding that the failure to enter into a voluntary securities transaction is neither a purchase nor a sale under the federal securities laws). Many times every trading day, an insider may decide *not* to purchase further shares in light of inside information that the share price is likely to decline, or decide *not* to sell portfolio shares in light of inside information that the share price is likely to rise. But such passivity is not a transaction for purposes of Section 16(b), which restricts insiders' trading, not their forbearance.

### (c) *The Regulations Exempting the Transaction.*

 Even if Magma succeeded in convincing us that what occurred in November and December, 1994 was a sale, Magma still could not compel Dow to disgorge any profits arising from that "sale," because, as the district court correctly held, such a sale would be exempt from the operation of Section 16(b).

The SEC has settled the issue in its Rule 16b–6(a), which provides that "the fixing of the exercise price of a right initially issued without a fixed price, where the date the price is fixed is not known in advance and is outside the control of the recipient ... shall be exempt from section 16(b) of the Act with respect to any offsetting transaction within the six months prior to the date the price is fixed." 17 C.F.R. § 240.16b–6(a) (1997). This case fits within that exemption.

Magma argues that "[w]hile the timing of Noteholders' requests to convert their Notes certainly required Dow to give consideration to how it would exercise its rights under the embedded option, Dow completely retained control over the time at which the price of that option would cease to float by retaining absolute and sole control over the decision of whether to provide converting Noteholders with cash or Magma shares." Brief of Plaintiff–Appellant Magma Power Co., at 28. Under the Indenture, however, the value of Dow's retained option became fixed on the date the noteholder's demand was received, and Dow had fourteen days to provide the shares or the cash. The noteholders were entitled under the Indenture to demand exchange *at any time* up to 2001, a decision over which Dow had no control. (They did so within six months of the Garantia purchase, evidently because California Energy's tender offer had run up the price of Magma's stock to a level that made exercise of their exchange rights worthwhile.) Because the value of Dow's option to satisfy the exchange demands became fixed on the date that the exchange demand was received, *see* Section 13.14 of Indenture, an event entirely in the control of third parties, we agree with the district court that the exemption prevents the imposition of Section 16(b) liability.

### CONCLUSION

For the foregoing reasons, Dow did not violate Section 16(b). The district court's

denial of Magma's motion for summary judgment and its grant of Dow's cross-motion for judgment on the pleadings are therefore affirmed.