**Jack LERNER, derivatively on behalf of EA Industries, Inc., Plaintiff,**

v.

**MILLENCO, L.P., Defendant.**

No. 97 CIV. 9226(SAS).

United States District Court, S.D. New York.

Aug. 11, 1998.

Jeffrey S. Abraham, Law Offices of Jeffrey S. Abraham, Jack Fruchter, Mitchell M.Z. Twersky, Fruchter & Twersky, New York, for Plaintiff.

Theodore Altman, Jon D. Kaplon, Gordon, Altman, Butowsky, Weitzen, Shalov & Wein, New York, for Defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiff Jack Lerner brings this action derivatively on behalf of EA Industries, Inc. ("EA") pursuant to Section 16(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78p(b), seeking the disgorgement of profits realized by defendant Millenco, L.P. ("Millenco") from certain purchases and sales of EA equity securities. Defendant moves to dismiss pursuant to Fed. R.Civ.P. 12(b)(6), and, in the alternative, for summary judgment under Fed.R.Civ.P. 56. Plaintiff, in turn, cross-moves for partial summary judgment under Fed.R.Civ.P. 56.

### I.  Factual Background

For purposes of this motion, the following facts are assumed to be true.  Broad Capital Associates, Inc. ("Broad Capital") exercised control of EA through its ownership of a substantial proportion of EA's outstanding common stock,[1] its role as an adviser to the company, and its placement of various employees on EA's board of directors.  Amended Complaint at ¶ 7. Broad Capital profits from its control over publicly traded companies like EA by causing them to issue debentures or preferred stock at a discount, and by then quickly selling the underlying common stock at a profit.  *Id.* at ¶ 8. In an effort to make the issuance and terms of the discounted securities appear to be the result of armslength bargaining and to evade certain reporting requirements, Broad Capital conducts these operations through and together with other persons.  *Id.* at ¶ 9. Those partici-

---

1.  At all times relevant to this action, EA's common stock was registered with the Securities and Exchange Commission ("SEC") pursuant to Sec-

tion 12(b) of the Exchange Act, 15 U.S.C. § 78l(b).

pating in Broad Capital's investment schemes act in a coordinated fashion to prevent the conversion and sale of the underlying common stock from exceeding investor demand, which would cause a collapse in the stock's trading price. *Id.* at ¶ 10. Millenco is a Delaware corporation which routinely participates in Broad Capital's investment schemes by coordinating its purchases of equity securities with other purchasers of the same securities. *Id.* at ¶¶ 10, 11.

### A. *The May 3, 1996 Purchase of EA Convertible Debentures*

On May 3, 1996, EA issued $7,000,000 of 9 percent Convertible Subordinated Debentures due May 3, 1998 (the "Convertible Debentures"), which were convertible into shares of EA common stock at the lesser of either: (1) 80 percent of the average of the closing price of EA common stock as traded on the New York Stock Exchange on the five days immediately preceding the date on which the holder provided EA with notice of conversion; or (2) $4.00 per share. *Id.* at ¶ 12. However, no less than $100,000 of the principal amount of the Convertible Debentures could be converted at any one time. *Id.*

Millenco purchased $2,800,000 of the EA Convertible Debentures on May 3, 1996. Millenco coordinated this purchase with at least five other purchasers of the Convertible Debentures (collectively, the "May 3rd Group"). *Id.* at ¶¶ 11, 13. On numerous prior occasions, Millenco had participated with these five entities in effectuating Broad Capital's investment schemes. *Id.* In total, the members of the May 3rd group purchased $7,000,000 of EA Convertible Debentures, which, when combined with other shares of EA common stock owned by members of the group, constituted more than ten percent of EA's outstanding common stock on May 3, 1996. *Id.* at ¶ 15.

Millenco had previously participated in Broad Capital's investment schemes with five other entities named in the Complaint (the "Broad Capital Group"). *Id.* at ¶¶ 11, 20. Millenco allegedly acted together with these five entities for the purpose of holding and disposing of their EA equity securities. *Id.* at ¶ 21. Between May 3, 1996 and September 25, 1996, Millenco sold off 40 percent of its EA Convertible Debentures—the same percentage that one member of the Broad Capital Group sold of its debenture holdings over the same period. *Id.* On September 25, 1996, Millenco still owned $1,680,000 of EA Convertible Debentures, which, at the time, were convertible to 700,000 shares of EA common stock. *Id.* at ¶ 23. The sum of these 700,000 shares and the common stock then owned by the Broad Capital Group exceeded ten percent of EA's outstanding common stock. *Id.*

### B. *The January 13, 1997 Agreement*

On January 13, 1997, all the holders of EA Convertible Debentures consented to a modification to the terms of the debentures. *Id.* at ¶ 26. This agreement revised the conversion formula in favor of the debenture holders, but prohibited them from converting or selling short the debentures until April 11, 1997. *Id.* Under the revised formula, the debentures could be converted to common stock at the lesser of (1) 80 percent of the average of the closing price of EA common stock as traded on the New York Stock Exchange on the five days immediately preceding the date on which the holder provides EA with notice of conversion; or (2) *$1.50 per share.* *Id.*

On or about January 22, 1997, Millenco acquired warrants to purchase 50,000 shares of EA common stock at a price of $1.50 per share as partial consideration for lending $1,000,000 to EA. *Id.* at ¶ 27. And on or about January 31, 1997, Millenco purchased an additional $200,000 worth of Convertible Debentures from another member of the May 3rd Group in a private transaction. *Id.* at ¶ 28. Finally, Millenco acquired $120,000 of Convertible Debentures sometime between September 25, 1996 and February 11, 1997, bringing the total value of its EA debentures on February 11, 1997 to $2,000,000. *Id.*

Pursuant to the January 13, 1997 agreement, the terms of the Convertible Debentures were amended on April 12, 1997 to reduce the fixed conversion price to $1.50 per share of common stock. *Id.* at ¶ 29. At this lower conversion price, Millenco could acquire 1,333,333 shares of EA common

stock—15.6 percent of the Company's outstanding shares. *Id.* at ¶ 30. On May 8, 1997 and May 30, 1997, Millenco exercised the conversion feature of some of its Convertible Debentures, acquiring at least 501,334 shares of EA common stock at the fixed conversion price of $1.50 per share. *Id.* at ¶ 31. Starting on May 8, 1997 and continuing through May 30, 1997, Millenco sold 490,700 shares of EA common stock for more than $1,300,000. *Id.* at ¶ 32.

In October 1997, plaintiff requested that EA's board of directors investigate and bring an action against Millenco under Section 16(b), based on the aforementioned facts. *Id.* at ¶ 34. EA did not bring the requested action, and plaintiff filed this action on March 6, 1998.

## II. Standard of Review Under Rule 12(b)(6)

In considering a 12(b)(6) motion to dismiss, a district court must limit itself to "facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 661 (2d Cir.1996) (internal quotations omitted). A court deciding such a motion must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the nonmovant's favor. *See Kaluczky v. City of White Plains*, 57 F.3d 202, 206 (2d Cir.1995). Furthermore, a 12(b)(6) motion to dismiss cannot be granted simply because recovery appears remote or unlikely on the face of a complaint, because "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir.1996) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). However, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir.1996) (internal quotations omitted).

## III. Liability Under Section 16(b)

### A. *Section 16(b) Generally*

Section 16(b) of the 1934 Exchange Act permits an issuer of securities or a holder of the issuer's securities to bring an action to recapture the profits made by a statutory insider from a purchase and sale of the issuer's securities that occurs within a six-month period. *See* 15 U.S.C. § 78p(b). A statutory insider includes one who "directly or indirectly" owns "more than 10 per centum of any class of any equity security" which is registered under Section 12 of the Exchange Act. *Id.* at § 78p(a).

Section 16(b) "operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition." *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 320–21 (2d Cir.1998). Strict liability and the penalty of disgorgement are imposed "to remove any temptation for insiders to engage in transactions which 'may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information.'" *Id.* at 320 (quoting *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 594, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973)).

### B. *Derivative Securities Under Section 16(b)*

In 1991, the SEC adopted comprehensive amendments to its rules under Section 16(b) to clarify the application of that section to derivative securities. *See* Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 28,869, [1990–1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 84,709, at 81,258 (Feb. 8, 1991) ("Release No. 28,869"). In promulgating the amended rules, the SEC "recognize[d] that holding derivative securities is functionally equivalent to holding the underlying equity securities for purposes of Section 16, since the value of the derivative securities is a function of or related to the value of the underlying equity security." *Id.* Failure to recognize this functional equivalence "would permit insiders to evade dis-

gorgement of short-swing profits simply by buying call options and selling the underlying stock, or buying underlying stock and buying put options." *Id.* The 1991 rule revisions that are relevant to this action can best be understood through the following hypothetical, which has been adapted from an example provided in SEC Release No. 28,869. *See id.* at 81,260.

Assume that on February 23, 1995, an insider of XYZ Co. owned 1,000 or more shares of XYZ common stock (priced at $102⅝ per share), which she had acquired more than six months earlier. Knowing that favorable company news was imminent, the insider purchased 10 XYZ call option contracts (covering 1,000 XYZ common shares) for $9,875 ($9⅞ per share), exercisable on or before October 19, 1995 at $100 per share. Then, on April 16, 1995, after the favorable news had been announced and the price of XYZ had increased to $110¾ per share, the insider sold 1,000 shares of common stock for $110,750. If, six months later, the price of XYZ stock had risen above $100 per share, then the insider could have exercised the call option, reaping a profit of $875.[2] If the price of XYZ stock six months later was at or below $100 per share, the insider could have simply purchased 1,000 shares at the market price, reaping a profit in excess of $875.

In this sequence of transactions, the insider did not purchase *and* sell shares of common stock, or even purchase *and* sell call options, within a six month period. Nevertheless, by selling 1,000 XYZ shares on April 16, less than two months after purchasing the XYZ call options, the insider locked in a short-term profit of $875.

The SEC's Rules were modified in 1991 so that Section 16(b) would cover such a transaction. *See* Release No. 28,869 at 81,260. Rule 16a–1(d) now defines the class of securities that is subject to Section 16 as consisting of "any equity security or derivative security relating to an issuer, whether or not issued by the issuer." 17 C.F.R. § 240.16a–1(d). Given the functional equivalence of a deriva-

tive security and its underlying security, Rule 16b–6(a) provides that "[t]he establishment of or increase in a call equivalent position or liquidation of or decrease in a put equivalent position shall be deemed a purchase of the underlying security for purposes of 16(b)."[3] 17 C.F.R. § 240.16b–6(a). Finally, Rule 16b–6(b) was amended to provide, in pertinent part, as follows:

> The closing of a derivative security position as a result of its exercise or conversion shall be exempt from the operation of Section 16(b) of the Act, and the acquisition of underlying securities at a fixed exercise price due to the exercise or conversion of a call equivalent position … shall be exempt from the operation of Section 16(b).

17 C.F.R. § 240.16b–6(b).

Pursuant to these rules, the short-term profit realized in the XYZ Corp. hypothetical would have been subject to disgorgement. The XYZ insider's February 23, 1995 purchase of the 10 XYZ call options would count as a purchase of 1,000 XYZ common shares at $100 per share, which would be matched with her sale of 1,000 XYZ common shares at $110¾ per share on April 16, 1995. However, under Rule 16b–6(b), the insider's eventual exercise of the call options would not constitute a purchase of XYZ common shares, because "the exercise of a fixed-price option [is] nothing more than a change from an indirect form of beneficial ownership of the underlying securit[y] to a more direct one." *Magma*, 136 F.3d at 322.

Also essential to the parties' dispute is Rule 16a–1(c)(6), which expressly excludes from the definition of derivative security any "[r]ights with an exercise or conversion privilege at a price that is *not fixed*." 17 C.F.R. § 240.16a–1(c)(6) (emphasis added). The rationale for excluding such rights is that they "do not provide an insider the same kind of opportunity for short-swing profit since the purchase price is not known in advance."

---

**2.** This profit is calculated as follows: the $110,-750 received from the sale of the shares on April 16 − (the $9,875 cost of purchasing the call options on February 23 + the $100,000 cost of exercising the options) = $875.

**3.** Rule 16a–1(b) defines the term "call equivalent position" as "a derivative security position that increases in value as the value of the underlying equity increases, including, but not limited to, a long convertible security, a long call option, and a short put option." 17 C.F.R. § 240.16a–1(b).

For example, in the XYZ Corp. hypothetical, the insider's opportunity to reap a guaranteed short-term profit on her call options was dependant on the option's exercise price being fixed. Only with a fixed exercise price could the insider be assured that the cost of reacquiring the shares (by exercising her call options) would be less than the amount for which she sold the shares following the announcement of favorable news. If the call option instead had a floating exercise price (e.g., at 80% of the NYSE price of XYZ's common shares on the exercise date), then on the exercise date, the exercise price might have exceeded the price at which she sold the 1,000 shares of common stock, resulting in a net loss. Because "the opportunity to lock in a profit begins when the exercise price is fixed," it is only at that point that "the right becomes a derivative security subject to Rule 16." Release No. 28,869 at 81,264.

## IV. Application of Section 16(b) to EA Convertible Debentures

### A. Are EA Convertible Debentures "Derivative Securities" for Purposes of Section 16(b)?

■ The parties' principal dispute is whether the EA Convertible Debentures qualify as "derivative securities" for purposes of Section 16(b) or whether they are excluded by Rule 16a–1(c) as "[r]ights with an exercise or conversion privilege that is not fixed." The debentures issued on May 3, 1996 were convertible into shares of EA common stock at the lesser of either (1) 80 percent of the average closing price of EA common stock as traded on the New York Stock Exchange on the five days immediately preceding the date on which the holder provides EA with notice of conversion; or (2) $4.00 per share. Thus, the debentures were convertible at either a fixed or a variable rate, depending on which formula produced a lower conversion price. The January 13, 1997 agreement modified this formula by reducing the fixed conversion price from $4.00 to $1.50 per share, and by prohibiting the debenture holders from converting or selling short any of their Convertible Debentures before April 11, 1997. Whether Section 16(b) applies to a security with a hybrid pricing structure—one part fixed, one part variable—presents a question of first impression.

An analysis of the Convertible Debentures' pricing structure reveals that the instruments provide their holders with an easy opportunity to realize a short-term profit. Because the debentures set a *maximum* conversion price, an insider holding the instruments could lock in a profit by following the same series of transactions as set forth in the XYZ Corp. hypothetical. Anticipating favorable news, the insider could (1) purchase the Convertible Debentures, (2) sell off some previously purchased common stock after the favorable news is announced, and (3) convert the debentures and reacquire the common stock after more than six months had passed. The insider would then be assured of a profit measured by the price at which it sold its common stock minus the sum of the debentures' purchase price and the debentures' maximum conversion price.

The debentures' variable pricing feature would in no way limit the insider's opportunity to lock in this short-term profit. The only possible effect of this feature would be to *lower* the conversion price, thus *increasing* the insider's profit upon conversion. Consistent with Congress' intent to prevent "the realization of short-swing profits based upon access to inside information," *Magma,* 136 F.3d at 320, and in light of "the SEC's efforts to foreclose the use of transactions in derivatives as vehicles for evading Section 16(b) liability," *id.* at 323, a convertible debenture with such a hybrid pricing feature must be classified as a "derivative security" for purposes of Rule 16a–1(c) and (d).

### B. The Effect of the Convertible Debentures' Status as "Derivative Securities"

■ Because EA Convertible Debentures qualify as derivative securities, defendant's conversions of the debentures on May 8, 1997 and May 30, 1997 are non-events for purposes of Section 16(b). As explained above, Rule 16b–6(b) exempts "the acquisition of underlying securities at a fixed exercise price due to the exercise or conversion of a call equivalent position" from Section 16(b). The statute therefore does not apply to the May 1997 acquisitions of EA common stock which resulted from Millenco's fixed-price deben-

ture conversions. Consequently, these acquisitions cannot be matched with defendant's sale of 490,700 shares of EA common stock, which allegedly occurred in May 1997.

■ Nevertheless, the January 13, 1997 agreement, which modified the Convertible Debentures' conversion rate, can be matched with defendant's sale of EA common stock. As explained above, Rule 16b–6(a) provides that an increase in a call equivalent position is equivalent to a purchase of the underlying security for purposes of Section 16(b). By lowering the Convertible Debentures' exercise price, the January 13 agreement raised the number of shares that Millenco could acquire by converting the debentures, and thus increased defendant's call equivalent position. Therefore, the January 13, 1997 modification to the Convertible Debentures' conversion rate was indeed a "purchase" for purposes of Section 16(b). However, because Section 16(b) applies only to purchases and sales made by statutory insiders, I turn next to the question of whether plaintiff has sufficiently alleged defendant's status as a statutory insider.

## V. Defendant's Alleged Status As A Statutory Insider

Plaintiff advances two theories under which it claims that defendant was a beneficial owner of more than ten percent of EA equity securities. First, plaintiff argues that Millenco's individual ownership of EA common stock surpassed the ten percent threshold once Millenco agreed to the modification of the debentures' exercise price. Second, plaintiff argues that the securities directly owned by Millenco must be aggregated with the securities held by members of the two groups with which it was allegedly affiliated—the Broad Capital Group and the May 3rd Group, thus raising defendant's ownership above ten percent.

### A.  *Individual Ownership Theory*

■ The Complaint avers that defendant become the beneficial owner of more than ten percent of EA common stock on January 13, 1997, when the maximum exercise price of its Convertible Debentures was lowered to $1.50

per share. However, a "right to acquire securities," including "any option, warrant, or right," is only included in the calculation of a defendant's beneficial ownership of the underlying securities when the right can be exercised within 60 days. *See* Rule 13d–3(d)(1)(i), 17 C.F.R. § 240.13d–3(d)(1)(i); *Morales v. New Valley Corp.*, 999 F.Supp. 470, 474 (S.D.N.Y.1998).

The January 13, 1997 agreement prohibited plaintiff from converting its debentures to common stock until April 11, 1997. Therefore, defendant's individual beneficial ownership of EA common stock did not pass the ten-percent benchmark until February 10, 1997—sixty days before April 11, 1997. As such, the January 13, 1997 agreement, as well as Millenco's January 22, 1997 acquisition of warrants to purchase EA common stock and its January 31, 1997 purchase of $200,000 of Convertible Debentures, occurred *before* defendant individually became a ten-percent beneficial owner of EA common stock. Based on defendant's individual holdings of EA securities, these transactions are not subject to Section 16(b) and thus cannot be matched with defendant's subsequent sales of EA shares.[4] Consequently, plaintiff's Section 16(b) claim turns on its group ownership theory.

### B.  *Group Ownership Theory*

#### 1.  *Pleading Group Membership*

■ Plaintiff contends that the calculation of Millenco's beneficial ownership of EA common stock should not be limited to securities that it individually owns, but should also include the debentures and common stock owned by other members of the May 3rd Group and the Broad Capital Group. Under this measure, plaintiff argues, Millenco was a beneficial owner of more than ten percent of EA common stock during the relevant time period.

Rule 13d–5(b)(1) provides that "[w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the

4. Section 16(b)'s disgorgement remedy applies only to a beneficial owner who was a statutory insider both at the time that it purchased the relevant securities *and* when it sold them. *See* 15 U.S.C. § 78p(b).

group formed thereby shall be deemed to have acquired beneficial ownership, ... as of the date of such agreement, of all equity securities of that issuer beneficially owned by such persons." Defendant contends that the Complaint's allegations of group membership are conclusory, and that plaintiff has not adequately pled that Millenco was a member of a group as defined by this rule.

The Complaint avers that on numerous prior occasions, Millenco coordinated its investments in companies controlled by Broad Capital with other members of the May 3rd Group and the Broad Capital Group for the purpose of artificially maintaining the market price of those companies' securities. The Complaint further avers EA was controlled by Broad Capital and that the members of the May 3rd Group, including Millenco, acquired Convertible Debentures on the same day, pursuant to a scheme similar to those in which they had previously participated.

The members of the Broad Capital Group also owned EA equity securities. The Complaint avers that Millenco acted together with the group's members for the purpose of holding and disposing of EA equity securities. In addition to alleging some prior coordinated securities purchasing by Millenco and the Broad Capital Group, the Complaint avers that one member of the Broad Capital Group reduced its ownership of EA Convertible Debentures by the exact same percentage as Millenco reduced its own holdings over the same time period. Finally, along with Millenco, all the members of the Broad Capital Group are alleged to have agreed to the January 13, 1997 modification of the debentures' terms. Under the liberal pleading standard of Fed.R.Civ.P. 8(a), the Complaint sufficiently alleges Millenco's membership in the two groups.

### 2. *Pleading the Groups' Ten Percent Ownership*

Regarding the two groups' ownership of EA common stock, the Complaint avers that (1) on May 3, 1996, the May 3rd Group beneficially owned shares that constituted more than ten percent of EA's outstanding

common stock; and (2) on September 25, 1996, the sum of Millenco's and the Broad Capital Group's beneficial ownership of EA common stock was more than ten percent of EA's outstanding common shares. With every inference drawn in his favor, plaintiff has sufficiently averred that Millenco, together with other members of the two groups, was a ten percent beneficial owner of EA common stock at the time of the relevant transactions.[5] Defendant's challenge to plaintiff's group ownership theory is therefore rejected and its motion to dismiss is denied.

## VI. The Parties' Summary Judgment Motions

Millenco also moves for summary judgment, challenging both the individual and group ownership theories of liability, and Lerner cross-moves for partial summary judgment under the individual ownership theory. Because plaintiff's individual ownership theory has been rejected, (1) the portion of defendant's summary judgment motion that concerns this theory, and (2) plaintiff's summary judgment motion are moot. Given that plaintiff has not yet had the opportunity to take any discovery from Millenco, *see* Rule 56(f) Affidavit of Jeffrey S. Abraham, the portion of Millenco's motion for summary judgment which concerns the group ownership theory is also denied, pursuant to Fed. R.Civ.P. 56(f). Upon the completion of discovery, defendant may renew its motion for summary judgment.

## VII. Conclusion

For the reasons stated above, plaintiff's individual ownership theory of liability is rejected. Nevertheless, because plaintiff may proceed under his group ownership theory, defendant's motion to dismiss is denied. Because plaintiff's summary judgment motion concerns only the individual ownership theory, that motion is also denied. Finally, defendant's summary judgment motion is de-

---

**5.** The dates of Millenco's alleged purchases and sales of EA securities are set forth in a chart annexed as Exhibit A. The pleadings do not suggest that the beneficial ownership of either the

May 3rd Group or the Broad Capital Group fell below the ten percent mark after passing that threshold.

nied pursuant to Fed.R.Civ.P. 56(f), and may be renewed after the close of discovery.

SO ORDERED

*Exhibit A*

| DATE | TRANSACTION |
| --- | --- |
| 5/3/96 | Millenco and other members of the May 3rd Group acquired more than a ten percent beneficial ownership in EA's outstanding common stock by purchasing $7 million of EA Convertible Debentures. |
| 5/3/96–9/25/96 * | Millenco sold $1.12 million of EA Convertible Debentures. |
| 9/25/96 | Millenco and the members of the Broad Capital Group beneficially owned more than ten percent of EA's outstanding common stock. |
| 9/25/96–2/11/97 * | Millenco purchased $120,000 of EA Convertible Debentures. |
| 1/13/97 * | Millenco agreed to a reduction in the Convertible Debentures' conversion rate, constituting a "purchase" of EA common stock. |
| 1/22/97 * | Millenco purchased $75,000 shares of EA common stock. |
| 1/31/97 * | Millenco purchased $200,000 of EA Convertible Debentures. |
| 5/8/97–5/30/97 * | Millenco sold more than $1.3 million of EA common stock. |

* These purchases and sales would be subject to Section 16(b) because they allegedly occurred after Millenco, together with others, became a beneficial owner of more than ten percent of EA's outstanding common stock and were made within six months of another sale or purchase of EA securities.