**Barbara SCHAFFER, Derivatively, on behalf of LASERSIGHT INCORPORATED Plaintiff,**

v.

**CC INVESTMENTS, LDC, Castle Creek Partners, LLC, Societe Generale Shepherd Investments International, Ltd., Stark International, Brian J. Stark, Michael A. Roth, and Lasersight Incorporated, Defendants.**

**No. 99 Civ. 2821(VM).**

United States District Court, S.D. New York.

Sept. 3, 2003.

---

---

Glenn F. Ostrager, Joshua Seth Broitman, Ostrager, Chong, Flaherty & Onofrio, P.C., Paul D. Wexler, Bragar, Wexler, Eagel & Morgenstern, L.L.P., New York, NY, for Barbara Schaffer.

Scott Edelman, Milbank Tweed Hadley & McCloy, Scott A. Edelman, Milbank, Tweed, Hadley & McCloy LLP, New York, NY, for CC Investments, LDC, Castle Creek Partners, LLC.

Steven Carl Bennett, Jones, Day, Reavis & Pogue, New York, NY, for Societe Generale.

Matthew Lawrence Craner, Daniel J. Kramer, Schulte Roth & Zabel, LLP, New York, NY, for Shepherd Investments Intern., Ltd., Stark Intern., Brian J. Stark, Michael A. Roth.

Gary Meyerhoff, Sonnenschein, Nath & Rosenthal, New York, NY, for Lasersight Inc.

### DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Barbara Schaffer ("Schaffer") brings this action pursuant to Section 16(b) of the Securities Exchange Act of 1934

(the "Act") for disgorgement of short-swing profits allegedly obtained by Defendants[1] acting as a group in violation of that section of the. Act. In a prior Decision and Order, dated December 20, 2002, this Court held that genuine issues of material fact existed as to whether Defendants agreed to act as a group, as such term is defined in Section 13(d) of the Act, for purposes of acquiring, holding, voting, or disposing of registered securities of the issuer.[2]

In the instant motion, SG and SR both move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment, arguing that none of their transactions identified by Schaffer constitute purchases of the issuer's securities within the meaning of Section 16(b) of the Act. In addition, CC moves for partial summary judgment, arguing that with the exception of two specified purchases, none of its transactions identified by Schaffer constitute purchases of the issuer's securities within the meaning of Section 16(b) of the Act. For the reasons discussed below, SR and SG's motions for summary judgment and CC's motion for partial summary judgment are DENIED.

## I. FACTUAL BACKGROUND [3]

On August 29, 1997, Defendants and Lasersight entered into a Securities Purchase Agreement (the "SPA") under which Lasersight agreed to sell to Defendants 1,600 shares of Lasersight's Series B Preferred Stock (the "Preferred Stock") and warrants (the "Warrants," and together with the Preferred Stock, the "Securities") to purchase 790,000 shares of Lasersight common stock (the "Common Stock"). The Preferred Stock was designed as a hybrid financial instrument, meaning that each share was convertible into a certain number of shares of Common Stock according to either a fixed or variable conversion formula.[4] Subsequent to the execution of the SPA, CC purchased 5,000 shares of Common Stock on September 5, 1997.

In March 1998, various market and business factors led Lasersight to become concerned about the potential dilution of the Common Stock. As a result, Lasersight

1. For purposes of this Decision and Order, "Defendants" refers collectively to three aggregations of investors: CC Investments, LDC and Castle Creek Partners, L.L.C. (collectively, "CC"); Societe Generale ("SG"), the parent corporation of SG Cowan Securities Corp. (formerly known as Societe Generale Securities Corp.); and Shepherd Investments International, Ltd., Stark International, Brian Stark, and Michael Roth (collectively, "SR"). However, this definition excludes Lasersight Inc. ("Lasersight"), the issuer of the relevant securities, which is named as a nominal defendant in this derivative action.

2. That decision is reported at *Schaffer v. CC Inv., LDC*, No. 99 Civ. 2821 (VM), 2002 WL 31869391 (S.D.N.Y. Dec. 20, 2002).

3. The facts of this case have been discussed repeatedly by the Court in four opinions related to this matter: *Schaffer*, 2002 WL 31869391; *Schaffer v. CC Inv., LDC*, 205 F.R.D. 158 (S.D.N.Y.2002); *Schaffer v. CC Inv., LDC*, 153 F.Supp.2d 484 (S.D.N.Y.2001); and *Schaffer v. CC Inv., LDC*, 115 F.Supp.2d 440 (S.D.N.Y.2000) ("*Schaffer I*"). As a result, the Court will not review the underlying facts in the instant Decision and Order except to the extent that they relate directly to issues arising from the instant motion.

4. The SPA specified the formula to convert shares of Preferred Stock into Common Stock: multiply the number of shares of Preferred Stock being converted by $10,000, then divide the result by the lesser of (i) $6.68 (the "Fixed Conversion Price") or (ii) the average of the three lowest closing bid prices of the Common Stock during the twenty trading days immediately preceding the conversion date (the "Floating Conversion Formula," and together with the Fixed Conversion Price, the "Conversion Formula").

initiated discussions with Defendants to limit their rights to convert the Preferred Stock into Common Stock. On March 13, 1998, Defendants and Lasersight entered into a Series B Preferred Stock Agreement (the "1998 PSA") under which Defendants agreed not to convert the Preferred Stock into more than one million shares of Common Stock, pro rated among them in accordance with their preferred holdings, through September 14, 1998,[5] and Lasersight received an option to repurchase the Preferred Stock at any time prior to that same date. In exchange, Defendants would receive a 20 percent premium on any such redeemed Preferred Stock, and would be granted a reduction in the exercise price of the Warrants issued as part of the SPA (the "Repricing"). However, the changes described in the 1998 PSA were contingent on approval by the Lasersight stockholders (the "Stockholders") at their annual meeting, which was scheduled for June 12, 1998.[6]

Around the same time, throughout March and April of 1998, Defendants converted over four hundred shares of Preferred Stock into Common Stock during several transactions (the "Conversions"). Pursuant to the Conversion Formula, the Conversions were made based on share prices ranging from $1.739583 to $1.989583. Then, on June 5, 1998, Lasersight exercised its option under the 1998 PSA and repurchased all of Defendants' remaining Preferred Stock.

Schaffer alleges that in engaging in these transactions, Defendants acted as a group as defined in Section 13(d) of the Act, and that the Conversions represent purchases that are matchable with sales occurring within six months of such purchases, and therefore the profits from the Conversions must be disgorged pursuant to Section 16(b). Schaffer also asserts that the Repricing represents a purchase for purposes of Section 16(b) and therefore is matchable with sales occurring within six months, which means that those profits should be disgorged as well.

Proceeding under the assumption that Defendants acted as a group pursuant to Section 13(d) of the Act,[7] Defendants respond that their initial acquisition of Preferred Stock under the SPA was not a Section 16(b) purchase because it was the initial transaction that put them over the 10 percent ownership mark, and such a transaction is not considered a Section 16(b) purchase under Supreme Court precedent. Moreover, Defendants aver that, on account of the hybrid nature of the Preferred Stock, the Conversions are not deemed to be purchases for Section 16(b) purposes under analogous precedents of this Court. Finally, Defendants contend that the Repricing did not make them beneficial owners of more than 10 percent of the Common Stock because the Repricing was contingent upon shareholder approval, which did not occur until June 30, 1998, by which time Defendants were not

---

**5.** In its Decision and Order dated December 20, 2002, the Court described this lockup period as lasting through June 12, 1998. *See Schaffer*, 2002 WL 31869391, at *2, 8. Upon review of the record for purposes of preparing this Decision and Order, the Court understands the correct date to be September 14, 1998. The discrepancy has no material effect on the Court's ruling in either today's or the earlier decision, and thus the Court merely notes the correction for the record.

**6.** The meeting was subsequently rescheduled to June 30, 1998, but this rescheduling does not have a material effect on the legal reasoning or outcome of the instant ruling.

**7.** The Court does not view Defendants' assumption for purposes of this motion that Defendants acted as a group pursuant to Section 13(d) of the Act to affect Defendants' rights to contest that assumption at a later stage in this litigation.

beneficial owners of more than 10 percent of the Common Stock.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

A motion for summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Rodriguez v. Hahn*, 209 F.Supp.2d 344, 346 (S.D.N.Y.2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The role of the Court is not to resolve issues of fact but rather "to determine as a threshold matter whether there are genuine unresolved issues of material fact to be tried." *Gibson v. Am. Broad. Cos.*, 892 F.2d 1128, 1132 (2d Cir.1989). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The nonmoving party "must support with specific evidence his assertion that a genuine dispute as to material fact does exist," *id.* at 324, 106 S.Ct. 2548, and "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998).

The opposing party's showing of a genuine dispute must be grounded in concrete evidence sufficient to support a reasonable jury's rendering a verdict in his favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). ("The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient."); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). All ambiguities and inferences drawn from the underlying facts must be resolved in the light most favorable to the party opposing the motion. *See United States v. One Tintoretto Painting Entitled The Holy Family With Saint Catherine and Honored Donor*, 691 F.2d 603, 606 (2d Cir.1982) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

### B. *INITIAL ACQUISITION OF THE SECURITIES*

Defendants argue that their initial purchase of the Securities on August 29, 1997 is not cognizable for the purposes of the public disclosure and disgorgement liabilities imposed on certain transactions under Section 16(b) of the Act because none of the Defendants was a beneficial owner of 10 percent of the Securities when it made those purchases. The Court agrees. Section 16(b) liability does not attach to "any transaction where such a beneficial owner was not [a 10 percent holder] both at the time of purchase and sale, or the sale and purchase, of the securities involved." 15 U.S.C. § 78p(b). Thus, as the Supreme Court has stated, the purchase of securities that first puts an entity's beneficial ownership above the 10 percent level is not a matchable purchase under Section 16(b). *See Foremost–McKesson, Inc. v. Provident Securities Co.*, 423 U.S. 232, 253, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976). As a result, "only purchases made after the entity has attained the 10 percent threshold can be matched with sales within six months and be subject to disgorgement." *Levy v. Oz Master Fund, Ltd.*, No. 00 Civ. 7148 AGS, 2001 WL 767013, at *11 (S.D.N.Y. July 9, 2001) (hereinafter, "Oz").

Here, Schaffer does not allege that Defendants were 10 percent beneficial owners prior to their purchases on August 29, 1997. Indeed, she could not make such an allegation because prior to August 29, 1997, Defendants owned none of the Securities. Thus, Defendants' initial purchase of the Securities is not subject to liability under Section 16(b).

## C. *DEFENDANTS' CONVERSIONS OF PREFERRED STOCK*

Schaffer next argues that the Conversions represent purchases that are matchable with sales occurring within six months of the Conversions, and that consequently the profits from those transactions must be disgorged. Defendants respond that the Conversions do not represent new purchases, but instead are simply exercises of a right to convert one form of previously-acquired security, namely the Preferred Stock, into another form of security, namely the Common Stock. Because of disagreement among courts that have addressed this issue, the Court proceeds with a thorough examination of precedent, professional commentary and the history of Section 16(b) itself to explain its conclusion in the instant case.

### 1. *Section 16(b) Generally*

Section 16 of the Act was enacted in order to prevent directors, officers and large stockholders of a corporation from using the confidential information they acquired through their positions to profit from public trading in the shares of that corporation. *See* 2 Ronald O. Mueller, *Federal Securities Exchange Act of 1934* § 8.01, at 8–7 (A.A.Sommer, Jr. ed.2003). As codified under Section 16(b), such a restriction means that any officer or director of an issuer, or any beneficial owner of more than 10 percent of any class of the issuer's equity securities that are regis-

tered under Section 12 of the Act, who sells and purchases, or purchases and sells, the issuer's equity securities within a six-month period and profits from the transaction is subject to civil liability. *See id.,* § 8.04, at 8–108 to 8–109.

While a corporate insider could conceivably abuse confidential information over a time period of any length, Congress focused in particular on transactions in which a purchase and sale both occurred within less than six months. While not spelled out in the legislative materials, a six-month period prohibiting such transactions is logical because "[i]mproper use of inside information by corporate insiders is most likely to occur in short-term, in-and-out trading." *Blau v. Max Factor & Co.,* 342 F.2d 304, 308 (9th Cir.1965). Such abuse happens in part because "the useful life of 'confidential' inside information is brief," *id.,* and, combined with the dramatic fluctuations that can occur in a stock's price over a six month period, these circumstances provide sufficient temptation to a corporate insider in possession of confidential information to use it to turn a profit. Indeed, "[t]he evidence upon which Congress acted indicated that the abuse [of confidential information] occurred almost entirely in short-swing transactions." *Id.*

Given this intention to target short-swing transactions, Congress crafted a "crude rule-of-thumb" to prevent such trading. Mueller, *supra,* § 8.01, at 8–9 (quoting *Hearings on Stock Exchange Practices before the Committee on Banking and Currency,* 73d Cong., 2d Sess. 6557 (1934)). The rule, codified as Section 16(b), not only prohibited all short-swing trading by an insider within a period of less than six months, but did so regardless of whether the insider actually used or even knew of inside information when engaging in the transaction. Thus, as de-

signed, Section 16(b) is not open to much interpretation or debate; it imposes a brand of strict liability. *See id.*, at 8–10 n. 12 (quoting Woodside, *Resume of the Report of the Special Study of Securities Markets and the Commission's Legislative Proposals*, 19 Bus. Law 463, 476–77 (1964)) ("Section 16(b) is about as subtle as a sledge hammer.... It doesn't leave much room for argument."). The provision "operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition." *Magma Power Co. v. Dow Chemical Co.*, 136 F.3d 316, 320–21 (2d Cir.1998).

### 2. *Derivative Securities under Section 16(b)*

 Despite its rigidity, Section 16(b) still embodied certain ambiguities until 1991, when the Securities and Exchange Commission (the "SEC") adopted comprehensive amendments (the "Amendments") to its rules under Section 16(b) in order to clarify the application of the section to derivative securities. *See Ownership Reports and Trading by Officers, Directors and Principal Security Holders*, 1991 WL 292000 (S.E.C. Release No. 28,869) (Feb. 8, 1991) (the "Release"). For the purpose of Section 16(b), a derivative security is defined as

> any option, warrant, convertible security, stock appreciation right, or similar right with an exercise or conversion privilege at a price related to an equity security or similar securities with a value derived from the value of an equity security....

17 C.F.R. § 240.16a–1(c). In promulgating the Amendments, the SEC "recognize[d] that holding derivative securities is functionally equivalent to holding the underlying equity securities for purposes of Section 16, since the value of the derivative

securities is a function of or related to the value of the underlying equity security." Release, *supra*, at *11. In other words, "[j]ust as an insider's opportunity to profit commences when he purchases or sells the issuer's common stock, so too the opportunity to profit commences when the insider engages in transactions in options or other derivative securities that provide an opportunity to obtain or dispose of the stock *at a fixed price." Id.* (emphasis added).

The Court's emphasis on the last part of that phrase reflects the SEC's distinction between derivative securities with a fixed exercise price and those without. The latter was specifically excluded from Rule 16a.1(c)'s definition of "derivative security" because

> [r]ights without a fixed exercise price do not provide an insider the same kind of opportunity for short-swing profit since the purchase price is not known in advance. The opportunity to lock in a profit begins when the exercise price is fixed; at that time, the right becomes a derivative security subject to Section 16.

*Id.*, at *17. Thus, under the Amendments, the acquisition, rather than the exercise, of a derivative security *with* a fixed exercise price would constitute a "purchase" for purposes of Section 16(b). Such a policy "treats the exercise of a fixed-price option as nothing more than a change from an indirect form of beneficial ownership of the underlying securities to a more direct one; because the insider by then is already bound by the terms of the option, the potential for abuse of inside information is minimal." *Magma Power*, 136 F.3d at 322. By contrast, the exercise, not the acquisition, of a derivative security *without* a fixed exercise price would constitute a "purchase" for purposes of Section 16(b). Such a policy acknowledges that with regard to floating price options, "the primary potential for abuse arises at the time of

exercise ... because only at exercise is the price fixed and, therefore, the extent of the profit opportunity defined." Release, *supra*, at *18 n. 148.

### 3. *Judicial Analysis of Hybrid Instruments*

In a perfect world devoid of legal adversity and lawyers' craft, the Amendments would have left no room for further confusion. In the real world, the introduction of "hybrid" financial instruments with both fixed and floating rates led to further litigation, as parties argued over whether these "hybrid" instruments should be considered derivative securities for purposes of Section 16(b). Four different courts, including three in this Circuit, have considered this question and "produced decisions that are difficult to reconcile, resulting in confusion among insiders as to how these instruments are to be treated under Rule 16a–1(c)(6)." [8]

In the first case, *Magma Power*, the Second Circuit was asked to examine on appeal the applicability of Section 16(b) to certain subordinated exchangeable notes that had been sold to the public by defendant. 136 F.3d at 322–23. Under the 1991 indenture pursuant to which the notes were issued, the noteholders could choose to exchange the notes at any time prior to maturity for a fixed number of shares in plaintiff's company, of which defendant was the largest minority shareholder and a beneficial owner for purposes of the Act. However, in the event of an exchange, defendant had the option of paying the noteholders in cash equal to the market value of the shares instead of giving them the shares themselves. Thus,

while defendant had in effect sold plaintiff's stock to the public when it issued the exchangeable notes, it left open the possibility that it could reacquire such stock by paying the noteholders the market price prevailing at the time of exchange.

In November and December of 1994, the noteholders exercised their exchange rights, and defendant chose not to utilize the cash option and instead gave the noteholders the pre-agreed number of plaintiff's stock. However, plaintiff sued for disgorgement of defendant's profits from the November and December 1994 exchanges, arguing that the exchanges should be considered "sales" for purposes of Section 16(b). Plaintiff asserted that because defendant had the option to pay the noteholders in cash rather than stock, the notes did not contain a true fixed price option and consequently were not derivative securities when issued in 1991. Instead, plaintiff claimed that defendant continued to have the opportunity to abuse its insider status up until the moment when the noteholders exercised their exchange rights because defendant had the option to retain the stock if defendant anticipated a further rise in stock prices or release the shares to converting noteholders if it anticipated that prices were likely to fall. Thus, under the theory propounded by plaintiff, "all options arising out of the same instrument must have a fixed exercise price before the creation of any of the constituent options can be deemed a sale." *Magma Power*, 136 F.3d at 323.

The Second Circuit disagreed, expressing concern that such an interpretation which "treat[s] the instrument rather than

---

**8.** Letter from Subcommittee on Employee Benefits, Executive Compensation and Section 16 of the American Bar Association's Section of Business Law's Committee on Federal Regulation of Securities, to David B.H. Martin, Jr., Director, Division of Corporation Finance, Securities and Exchange Commission (March 30, 2001), attached to Peter J. Romeo & Alan L. Dye, *Insider Trading Under Rules 10b5–1 and 10b5–2*, 1278 PLI/Corp 499, at *597 (2001) (hereinafter, the "ABA Letter").

the component options as the relevant unit for 16(b) purposes [ ] is problematic." *Id.* Instead, the Second Circuit explained, "the better approach is to treat as analytically distinct each option contained" in the note: the fixed price option granted to the noteholders and the floating price option retained by defendant. *Id.* Thus, the Second Circuit proceeded to examine each option separately.

First, the Second Circuit concluded that the noteholders' exercise of their fixed-price options was a non-event for purposes of Section 16(b) because at the time of exercise, the parties were already bound by the contractual terms of the option and therefore knew exactly how many shares each noteholder could receive upon conversion. Next, with regard to the floating price option, the Circuit Court found that it "was not an option to sell the shares at a floating price," but rather a "right to repurchase the shares that it was otherwise obligated to deliver by paying the noteholders the market price prevailing at the time of receipt of the exchange demand." *Id.* at 324. Thus, rather than a sale, the option in fact caused a purchase, and consequently could not be matched against another purchase to create Section 16(b) liability.

Even if what had occurred were considered a sale, the *Magma Power* court found that the transaction would be exempt from Section 16(b) because the control over when to exercise the option was in the hands of the noteholders, and not in the defendant's. Thus, the option fell under the exemption described in Rule 16b–6(a), which provides that "the fixing of the exercise price of a right initially issued without a fixed price, where the date the price is fixed is not known in advance and is outside the control of the recipient . . . shall be exempt from section 16(b) of the Act with respect to any offsetting transaction

within the six months prior to the date the price is fixed." 17 C.F.R. § 240.16b–6(a) (1997).

Later the same year, in *Lerner v. Millenco L.P.*, 23 F.Supp.2d 337 (S.D.N.Y. 1998), *reconsideration denied*, 23 F.Supp.2d 345 (S.D.N.Y.1998), the district court encountered a similar issue closer in fact pattern to the instant case. In *Lerner*, the court examined certain convertible debentures purchased by the defendant in May 1996, whose hybrid conversion feature, revised in January 1997 pursuant to an agreement between the parties, provided that the debentures were convertible into shares of common stock at the lesser of (i) $1.50 per share, or (ii) 80 percent of the average closing price of the common stock as traded on the New York Stock Exchange on the five days immediately preceding the date on which the holder provided notice of conversion. *See id.* at 339. In May 1997, the defendant exercised the conversion feature of some of the debentures, acquiring certain shares of common stock at the fixed price of $1.50 per share, and then sold those shares for a profit. *See id.* at 340. Plaintiff alleged that these conversions counted as "purchases" for purposes of Section 16(b), and therefore were matchable with defendant's sale of common stock during that same month.

The *Lerner* court disagreed, finding that "a convertible debenture with such a hybrid pricing feature must be classified as a 'derivative security' for purposes of Rule 16a–1(c) and (d)." *Id.* at 342. The court explained that because the convertible debentures set a maximum conversion price, an investor could lock in his profit upon the acquisition of the security in the same way he could if the debenture only featured a fixed price conversion feature. *See id.* The presence of a floating price mechanism "in no way limit[ed] the insid-

er's opportunity to lock in this short-term profit," because, although the actual rate of conversion was unknown, the application of the floating rate would lower the conversion price, thus increasing the number of shares owned, and the insider's profit, upon conversion. *Id.* Thus, regardless of whether the fixed or floating rate prevailed, the *Lerner* court concluded that the conversion price is established prior to conversion as either the fixed conversion price or a lesser amount, and the investor consequently has sufficient knowledge at the time of acquisition to motivate him to conduct short-swing transactions on the basis of inside information.

Based on this conclusion, the *Lerner* court found that "defendant's conversions of the debentures on May 8, 1997 and May 30, 1997 are non-events for the purposes of Section 16(b)," and did not constitute "purchases" of stock under the Section. Rather, as with convertible securities that have a fixed price conversion feature, the purchases were deemed to occur upon the acquisition of the debentures in May of 1996. *See id.* at 342–43. In addition, the subsequent modification of the conversion rate in January of 1997 counted as an additional purchase because "Rule 16b–6(a) provides that an increase in a call equivalent position is equivalent to a purchase of the underlying security for purposes of Section 16(b)." [9] *Id.* at 343.

Eighteen months later, a district court in Delaware weighed in on the matter. In *Levy v. Clearwater Fund IV, Ltd.,* No. 99 Civ. 004-SLR, 2000 WL 152128 (D.Del. Feb.2, 2000), the court was presented with preferred stock, sold to defendant in August 1996, that contained a hybrid conversion feature similar to that in *Lerner:* the

lesser of (1) $4.40, or (2) 80 percent of the average closing bid prices of the common stock as quoted for the five days immediately preceding the date of the notice of conversion. *See id.* at *1. In December 1997, defendant converted $3,000,000 of the preferred stock into shares of common stock at a price of approximately $0.72 per share, pursuant to the floating conversion privilege. On March 5, 1998, defendant sold at a profit approximately one half of the common shares it had acquired. *Id.* at *2. Plaintiff alleged that this sale was matchable with the December 1997 conversions because such conversions qualified as "purchases" for purposes of Section 16(b).

"[R]espectfully disagree[ing] with the conclusion reached in *Lerner,*" the *Levy* court held that the preferred stock in question was not a "derivative security," and that consequently defendant's December 1997 conversion of such stock was a "purchase" for purposes of Rule 16(b). *Id.* at *4 and n. 2. To reach this conclusion, the court focused on the SEC's suggestion in the Release "that the focus of the inquiry [regarding a derivative security's exemption from Section 16(b) ] should be on whether the opportunity to profit is conditioned upon the occurrence of events outside the option holder's control." *Id.* at *3. Because a security with a hybrid conversion privilege allows the option holder to "choose the floating component in order to exploit insider information by the timing of the exercise and consequent fixing of the 'acquisition' price," the court reasoned that "[t]he opportunity for profit, as well as for abuse of insider information, is more within the control of the option holder and, consequently, more deserving of oversight." *Id.* at *4. In essence, the court saw

---

9. Rule 16a–1(b) defines the term "call equivalent position" as "a derivative security position that increases in value as the value of the underlying equity increases, including, but not limited to, a long convertible security, a long call option, and a short put option." 17 C.F.R. § 240.16a–1(b).

no difference between a hybrid instrument and one with no fixed price component at all.

Moreover, the court viewed the fixed price component as a ceiling, not an actual known quantity, because "[b]y its very terms, ... the option's exercise price is unknown until [defendant] gives notice of conversion. The holder only knows that the price will not exceed [the fixed price]." *Id.* at *4. Thus, the court considered the moment when the option holder became certain of the price as the moment of "purchase," which, in the court's view, would not occur with a hybrid instrument until exercise of the option.

The following year, the same plaintiff in *Levy* appeared before another court in this district in *Oz*. As in the previous two cases, the matter in dispute concerned preferred stock with a "hybrid" pricing structure, offering both a fixed and floating rate of exchange.[10] Between November 2, 1999 and March 3, 2000, defendant allegedly converted the preferred stock to common stock at conversion prices with floating rates between and including $0.5062 and $1.0688 per share, and then sold these common shares within six months. Plaintiff alleged that the conversions had been "purchases" for purposes of Section 16(b), and thus were matchable with the sales that occurred within the following six months.

After an extensive analysis of the Amendments, *Lerner*, and *Levy*, the *Oz* court rejected the *Levy* analysis, arguing that the *Levy* court had examined the fixed and floating privileges in isolation, but had failed to consider the operation of the hybrid instrument in practice. As opposed to the *Levy* court's assertion that the opportunity for profit is within the control of the option holder, the *Oz* court contended that "the 'choice' of fixed versus floating price privileges is dictated by the market price of the security, not the investor per se." *Id.* at *7.

Moreover, the *Oz* court found that "the fixed price enables the investor who has received inside information to lock his position with a minimum number of shares, and, thereby, realize a minimum profit." *Id.* Thus, "the exercise or conversion price is established prior to conversion; it will either be the fixed conversion price or a lesser amount." *Id.* at *8. This knowledge is sufficient enough for the investor "to lock in [his] position with respect to the underlying security, and creates an incentive to conduct short-swing transactions on the basis of inside information." *Id.* As a result, the court concluded, a hybrid instrument invokes the same investor response as one with only a fixed price component, and should consequently be treated the same way as a fixed price instrument for purposes of Section 16(b).

### 4. SEC's Amicus Curiae Brief in Levy v. Southbrook International Investments, Ltd.

Prior to filing an amicus curiae brief (the "Brief") with the Second Circuit in *Levy v. Southbrook Int. Inv., Ltd.*, 263 F.3d 10 (2d Cir.2001), the SEC had not provided any guidance on the treatment of hybrid derivative instruments under the derivative security scheme adopted in the Amendments. However, the issues involved in *Southbrook* led the Second Circuit to request input from the SEC on how such hybrid instruments should be treated.

In *Southbrook*, again featuring the ubiquitous Mr. Levy as the plaintiff, defendant

---

**10.** In similar fashion to *Lerner* and *Levy*, the conversion price was the lesser of either (i) $5.25, or (ii) 90 percent of the average three lowest closing bid prices for the twenty business days preceding the date of conversion.

owned convertible preferred stock that was convertible into common stock at either a fixed rate (determined by dividing $1,000, plus accrued dividends, by a fixed rate determined at the date of purchase of the particular issue of convertible preferred stock) or a floating rate (determined by dividing $1,000, plus accrued dividends, by the applicable percentage of the average closing bid price of the common stock for the five consecutive trading days immediately preceding the date of conversion). While the question at issue in *Southbrook* was whether defendant, by virtue of holding a company's convertible preferred stock, was beneficial owner of more than 10 percent of the company's common stock, the Second Circuit asked the SEC to present its view on, among other things, the issue of whether preferred stock with a hybrid convertible feature was properly considered a fixed rate derivative security or a floating rate derivative security.

In its Brief, the SEC noted that the fixed rate component of the hybrid instrument involved in *Southbrook* "sets a floor below which the number of common shares received on conversion will not decline," with the result that "the holder's minimum opportunity to profit from the underlying common stock is established at the time the holder *acquires* the convertible preferred stock." (Brief, dated March 2001, attached as Exh. A to Declaration of Paul D. Wexler, dated July 14, 2003, at 26–27) (emphasis added). By contrast, the SEC observed that the floating rate component "provides for the investor to convert into an increasing number of common shares as the market price of the common shares declines," with the result that "[t]he holder's opportunity to profit with respect to any additional shares of common that it may acquire through the floating rate component is not fixed until *conversion.*" (*Id.* at 27) (emphasis added).

As a result of this conclusion, the SEC observed that, pursuant to Rule 16a–1(a)(2)(ii)(F), the "acquisition of convertible preferred stock with a fixed conversion price establishes an indirect pecuniary interest in the underlying common stock, whereas acquisition of convertible preferred stock with a floating conversion price does not." (*Id.* at 28.) For the defendant in *Southbrook*, this meant that it had "acquired an indirect pecuniary interest in that minimum number of common shares at the time [the defendant] acquired the convertible preferred stock," but "would not acquire a pecuniary interest in any additional shares of common stock through the convertible preferred stock before its conversion, at which time the conversion price would fix to determine what—if any—additional shares of common would be obtained through the floating price component." (*Id.* at 29.)

Thus, the SEC's position in the Brief is similar in approach to that of the *Magma Power* court, separating the hybrid instrument into two distinct derivative instruments. Under such independent analysis, the SEC concluded that a holder of convertible preferred stock has an opportunity to profit, either directly or indirectly, from a transaction in that preferred stock only if the conversion price is fixed. If the convertible preferred stock has a floating conversion price, then such opportunity to profit cannot occur until the price is fixed, which would only happen through conversion of the preferred stock. Therefore, under the SEC's reasoning, the acquisition (or disposition) of a hybrid instrument results in (1) an immediate acquisition (or disposition) of a derivative security with respect to the minimum number of shares of underlying common stock that can be acquired under the fixed rate component, and (2) a subsequent purchase (or sale) at the time of conversion of any additional

shares acquired (or disposed of) at that time under the floating rate component.[11]

### 5. Discussion of Defendants' Preferred Stock

■ The foregoing discussion leads the Court to the question at issue in the instant case: were the Conversions purchases or non-events for purposes of Section 16(b)? The Court answers the question by declining to follow previous judicial rulings which reasoned that a hybrid instrument must be treated as akin to an instrument with either only a fixed or only a floating option, and instead adopts the SEC's reasoning as outlined in the Brief.

Under such reasoning, when each Defendant purchased Preferred Stock under the SPA on August 29, 1997, each Defendant is considered to have purchased for purposes of Section 16(b) the minimum number of shares of underlying Common Stock (the "Minimum Number") that could be acquired pursuant to the Fixed Conversion Price. Subsequently, when each Defendant converted some of its Preferred Stock into Common Stock in March and April of 1998 pursuant to the Floating Conversion Formula, it was considered to have purchased for purposes of Section 16(b) only those shares of Common Stock that exceeded the Minimum Number (the "Additional Shares"). Under this construction of the rule, it is the profit from the matchable purchase and sale of the Additional Shares that is subject to disgorgement for purposes of Section 16(b).

How this construction of the rule affects Defendants depends in part on whether a jury finds that Defendants agreed to act as a group pursuant to Section 13(d) of the Act. If a jury were to find that Defendants acted as a group pursuant to Section 13(d) of the Act for purposes of acquiring, holding, voting, or disposing of registered securities of the issuer, then the total number of shares of Preferred Stock purchased pursuant to the SPA and converted in March and April 1998 by all Defendants would need to be considered as a whole. However, it is unclear from the record whether Defendants, if found to have been acting as a group, would exceed their Minimum Number. The Conversions of SR and SG appear to have fallen approximately 185,868 shares [12] and 199,586 shares,[13] respectively, below their Minimum Number. Yet, CC's Conversion exceeded its Minimum Number by 331,942 shares [14]

**11.** The SEC later explains that this reasoning does not apply when determining whether an investor is a more than 10 percent beneficial owner because the 10 percent ownership provisions of Rule 16a–1(a)(1) rely on the Section 13(d) standards rather than the derivative security standards when dealing with hybrid instruments. See Brief, supra, at 30. For purposes of this Decision and Order, such distinctions are unnecessary to consider in the Court's discussion.

**12.** The Court calculates this number by totaling the share numbers provided in a series of letters between Lasersight and SR detailing SR's Conversions and subtracting the resulting sum from SR's Minimum Number as calculated by using the Fixed Conversion Price. (See Exhs. 5, 6, 7 & 8 to Affidavit of Roger A. Burlingame, dated June 9, 2003 ("Burlingame Dec.").)

**13.** The Court calculates this number by totaling the share numbers provided in a series of letters between Lasersight and SG detailing SG's Conversions and subtracting the resulting sum from SG's Minimum Number as calculated by using the Fixed Conversion Price. (See Exhs. 7, 8, 9 & 10 to Declaration of Thomas E. Lynch in Support of Societe Generale's Motion for Summary Judgment, dated June 9, 2003.)

**14.** The Court calculates this number by totaling the share numbers provided in a series of letters between Lasersight and CC detailing CC's and SR's Conversions and subtracting the resulting sum from CC's Minimum Num-

plus a certain number of common shares that cannot be determined from the transaction letter provided by CC. (*See* Exh. H to Bak Dec.) (detailing the conversion of 10 shares of Preferred Stock into shares of Common Stock). If this latter Conversion of 10 shares of Preferred Stock resulted in more than 53,512 shares of Common Stock—which would have occurred if the Floating Conversion Formula were $1.868 or lower—then the Defendants, if found to have acted as a group, would be liable under Section 16(b) because Defendants as a group would still exceed their Minimum Number. Since the record on this fact is unclear, the Court is unable to grant summary judgment for Defendants.

Even if the Court determined that Defendants—assuming they were found by a jury to have acted as a group—did not exceed their Minimum Number, and were consequently not liable for purposes of Section 16(b), the Court's analysis would not be complete. The Court would still need to consider each Defendant's individual liability in the alternative contingency that a jury found that Defendants did not act as a group. In such an instance, the rule as explained by the Court above would need to be applied individually to each Defendant. Because the beneficial ownership status of each Defendant has not yet been proven as a matter of law,[15] the Court will not consider at this time whether each Defendant would be liable under Section 16(b) on an individual basis.

The Court believes that its ruling more clearly comports with the purpose of Section 16(b) and the Amendments than previous applications of the rule to the type of convertible securities here at issue. Moreover, this determination derives from and is consistent with Second Circuit precedent in *Magma Power* insofar as that case had been decided prior to and may have influenced the position the SEC propounded in the Brief, and thus bears on the issues at hand. Under this approach, an investor who acquires preferred stock that converts into common stock based on a fixed or floating formula is consequently liable for any short-swing trading made in the previous or subsequent six months with respect to only the minimum number of shares convertible pursuant to the fixed formula. Thus, he is prevented from utilizing insider information during that six-month period before and after locking in his profit through the fixed formula. Once outside that six-month period, the preferred stockholder can convert the preferred stock pursuant to the floating formula, if applicable, but he is then liable for any short-swing trading made in the previous or subsequent six months with respect to only those shares exceeding the minimum number of shares convertible pursuant to the fixed formula. Consequently, the preferred stock investor is prevented from utilizing insider information during that six-month period before and after locking in his profit through the floating formula.

---

ber as calculated by using the Fixed Conversion Price. (*See* Exhs. E, F, & G to Declaration of Sander Bak, dated June 9, 2003 ("Bak Dec.").)

**15.** In *Schaffer I*, the Court, ruling on a motion to dismiss, found that Schaffer could not sufficiently allege as a matter of law that Defendants individually were greater than 10 percent beneficial owners of the Common Stock because of the presence of certain conversion

caps on the Preferred Stock. *See Schaffer I*, 115 F.Supp.2d at 443. However, since the Court relied mainly on Schaffer's allegations at the motion to dismiss stage, such a finding does not satisfy the evidentiary burden required at the summary judgment stage, and consequently this previous ruling is insufficient to serve as a finding of fact upon which the Court can base its Section 16(b) analysis.

Implicit in this approach is the acknowledgment that a hybrid instrument presents an investor with not one, but two opportunities to lock in profit and conduct short-swing trading based on inside information: first, at the acquisition of the preferred stock, due to the fixed formula, and again at the conversion of the preferred stock, due to the floating formula. By focusing only on the first opportunity, the *Lerner* and *Oz* courts both disregarded the potential for abuse that could occur at the conversion stage. Indeed, the *Lerner* court went so far as to minimize the effect of the floating price component, arguing that its only effect is to increase the investor's profit above the level the investor locked in upon purchase of the preferred stock. Yet, given Congress' intent to prevent "the realization of short-swing profits based upon access to inside information," *Magma Power*, 136 F.3d at 320, it strikes this Court as unwarranted to ignore an investor's ill-gotten gains simply because they exceed his original expectations.

The Court's interpretation also avoids the two-track system—whereby the conversion of a particular security would be a purchase if it occurred at a floating rate but not if it occurred at a fixed rate—that troubled the *Oz* court. The *Oz* court was concerned that "the potential applicability of Section 16(b) to a transaction would be unknown until immediately before, or in some cases after, the transaction occurs." 2001 WL 767013, at *10. Here, a holder of hybrid preferred stock would know at the moment of acquisition the exact number of shares of common stock he was purchasing for purposes of Section 16(b). Later conversions would then be considered purchases only if they exceeded that initial number of common stock determined under the fixed formula.

### 6. *Defendants' Response*

In the reply memoranda filed in the instant case, Defendants contest the line of reasoning the Court presents above, in particular discounting any reliance by this Court on the Brief. First, Defendants argue that the Brief addressed a different issue than the one in the instant case. While the issue being litigated in *Southbrook* was indeed distinct from the case at bar, one of the three questions presented to the SEC by the Second Circuit was

> whether preferred stock that is convertible into common stock by dividing $1,000 plus accrued dividends by the lesser of (a) a fixed price determined at the date of purchase of the particular issue of preferred stock or, (b) the applicable percentage of the average closing bid price of the common stock for the five consecutive trading days immediately preceding the date of conversion ... is properly considered a fixed rate derivative or a floating rate derivative security. ...

(Brief, *supra*, at 3.) In other words, the SEC was asked its opinion of whether a hybrid instrument with a fixed and floating conversion formula should be considered a fixed or floating rate derivative. This question is *directly* applicable to the case at bar, and the SEC's reasoning offers substantial guidance to the Court in determining how to treat the Preferred Stock.

Indeed, the Subcommittee on Employee Benefits, Executive Compensation and Section 16 of the American Bar Association's Section of Business Law's Committee on Federal Regulation of Securities (the "Subcommittee")—whose Chair of the Drafting Committee for the letter, Peter J. Romeo, is described by counsel to one of the Defendants as being "the leading Section 16(b) commentator" [16]—agrees. In a letter to the SEC's Director of Division of

16. See Memorandum of Law of Defendants

Shepherd Investments International, Ltd.,

Corporation Finance that commented on the Brief, the Subcommittee noted that it was "pleased that the [SEC had] provided guidance regarding the treatment of hybrid instruments under the derivative securities ... provisions" and "agree[s] generally with the [SEC's] views," which the Subcommittee believed would "help to provide certainty to an area that is beset by differences of opinion." ABA Letter, *supra*, at *599.

Moreover, courts have typically been "bound by the SEC's interpretations of its regulations in its amicus briefs, unless they are plainly erroneous or inconsistent with the regulations." *Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 128 (2d Cir.2000). Although the SEC did not appear as an amicus in this case, the Court still finds the SEC's views persuasive and directly relevant to the case at bar. As those views were upheld by the Second Circuit in the case in which the SEC filed the Brief, *see Southbrook*, 263 F.3d at 14–15, the Court is satisfied that such views deserve the deference to which the views of the agency administering a statute are usually entitled. *Cf. Foremost–McKesson, Inc. v. Provident Securities Co.*, 423 U.S. 232, 259–60, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976) (refusing to follow the SEC's views in an amicus brief filed in a prior, unrelated action even if those views had not changed because the court in the prior case had "rejected the basic theory on which the SEC based its interpretation").

Defendants also contend that if the Brief is considered to be the announcement of a new approach by the SEC with regard to the treatment of hybrid instruments, it is unfair to hold Defendants liable because Defendants did not have fair notice of this interpretation. The Court disagrees. The Conversions occurred prior to the rulings in *Lerner*, *Levy*, and *Oz*, which means that at that time, Defendants had the Amendments and *Magma Power* as guidance in determining how to treat the hybrid instruments. The Court finds those two sources sufficient to support the conclusion the Court reaches today. The Amendments clearly distinguished the treatment under Section 16(b) between a derivative security with a fixed price option and one with a floating price option, and noted the potential for abuse when using a floating price formula. After discussing the Amendments, *Magma Power* built on their precedent by analyzing each option separately, as opposed to considering the instrument as a whole, so as not to "offer insiders an opportunity to avoid Section 16(b) that poses so little challenge to ingenuity." [17] *Magma Power*, 136 F.3d at 323. Thus, the Court does not consider the Brief to offer anything new from these

Stark International, Brian J. Stark and Michael A. Roth in Support of Their Motion for Summary Judgment, dated June 9, 2003, at 10.

**17.** Defendants also contend that *Magma Power* did not address a conversion right with a hybrid conversion formula. Instead, Defendants assert that the notes in *Magma Power* contained two separate option provisions, the fixed price option operable by the noteholders and the floating price option operable by defendant. The Court disagrees. The notes in *Magma Power* were analogous to the hybrid preferred stock in the instant case in that they contained a formula which converted the notes into alternative forms of consideration (*i.e.*, a fixed number of shares of stock or a variable amount of cash based on the market value of such shares as the time of exchange) as selected by the defendant. The Second Circuit's analysis and reasoning, which involved examination of Section 16(b) and the Amendments, provides considerable guidance to anyone attempting to understand Section 16(b)'s treatment of hybrid instruments. The Court also notes that the Subcommittee shares this assessment, having referred to *Magma Power* in the ABA Letter as a decision directly applicable to the issue of how hybrid instruments are treated under Section 16(b). *See* ABA Letter, *supra*, at *597.

previous discussions by the SEC and the Second Circuit, and is not persuaded that Defendants had no notice that such a line of reasoning existed, or that it could serve as grounds for the application of Section 16(b) this Court now adopts.[18]

## D. *REPRICING OF THE WARRANTS*

■ Schaffer also alleges that the Repricing pursuant to the 1998 PSA represents a purchase for Section 16(b) purposes, which could then be matched with Defendants' sales of stock. Defendants contend that the Repricing was contingent upon stockholder approval, which did not occur until June 30, 1998. By this time, Defendants argue, Lasersight had redeemed all of Defendants' Preferred Stock, so Defendants no longer beneficially owned more than 10 percent of the Common Stock and thus would not be liable under Section 16(b) on this basis. The Court agrees with Defendants.

Among other things, the 1998 PSA limited Defendants' conversions of their Preferred Stock to no more than one million shares of Common Stock between March 13 and September 14, 1998 (the "Restricted Period"). The 1998 PSA also offered a proposed revision of the Fixed Conversion Price section of the Corrected Certificate of Designations, Preferences and Rights for the Preferred Stock that altered the Floating Conversion Formula. Assuming that the Restricted Period did not terminate for other reasons prior to September 14, 1998, the revised conversion formula (the "Revised Formula") changed the Floating Conversion Formula to

> 110% of the average Closing Bid Prices of the Common Stock ... for the twenty (20) consecutive trading days ending on the last day of the Extended Restricted Period....

(1998 PSA, attached as Exh. 1 to Burlingame Dec., at 5.) Before these changes could be enacted, however, the revision had to be approved by the Stockholders at their annual meeting, which was scheduled for June 12, 1998. In the event the proposal was not approved on or before June 12, 1998 or the 1998 PSA was terminated due to a material adverse change in Lasersight's financial situation, Lasersight would then issue to Defendants warrants to acquire up to 750,000 shares of Common Stock at a per share exercise price to be determined by a different formula than the Revised Formula (such issuance hereinafter called the "Alternate Plan"). Under the Alternate Plan, the per share exercise price would be

> one hundred fifteen percent (115%) of the average Closing Bid Prices of the Common Stock ... for the five (5) consecutive trading days beginning on the date immediately following the later of (i) Lasersight's public announcement of Lasersight's results from operations for the period ended December 31, 1997, or (ii) Lasersight's public announcement of [the 1998 PSA]....

(*Id.* at 4.) Lasersight issued a press release on March 17, 1998 (the "Press Release") announcing the 1998 PSA, three days after releasing a press release that reported Lasersight's operational results

---

18. Counsel to the Defendants also argue that the decisions in *Oz* and *Lerner* demonstrate that Defendants' interpretation of Section 16(b) is reasonable because two judges of this Court reached the same conclusion. Given that Section 16(b) is a strict liability statute with no sympathy for incorrect interpretations by investors, the Court is not persuaded that Defendants should be excused for their

misinterpretation merely because their theory finds some support in rulings by other distinguished members of this Court. Instances do arise in which different members of this Court respectfully disagree as to equally plausible readings of this intricate area of the law. *See, e.g., Egghead.Com Inc. v. Brookhaven Capital Mgt. Co.,* No. 02 Civ. 7550, 2003 WL 21864805, at *5–6 (2d Cir. Aug.8, 2003).

from the fourth quarter of 1997. *See* Lasersight Inc., Form 8–K, WL FILING 98567780 (March 18, 1998). Thus, the per share exercise price to be used in the event the 1998 PSA's proposed changes were not approved was determined in the five consecutive trading days following the issuance of the Press Release. *See id.* ("If holders of Lasersight's common stock do not approve the new agreement at the annual meeting, the company is required to issue 750,000 additional warrants to the preferred holders to purchase common stock equal to 115 percent of an average price of the common stock for five days before or after the issuance of this press release.").

As discussed above, a derivative security with a floating price option is not considered a purchase for purposes of Section 16(b) until the moment when the security is converted into common stock. The Revised Formula is a floating price formula, one that prevents the warrantholder from knowing the conversion price until after the end of the Restricted Period. Thus, the execution of the 1998 PSA did not provide Defendants with knowledge of a fixed price position for the Warrants, and thus cannot be considered a purchase for purposes of Section 16(b).

Schaffer responds that the stockholder approval was not a real contingency because in the event the Repricing was rejected by the Stockholders, Defendants would still receive 750,000 warrants at a fixed per share exercise price under the Alternate Plan. While the Court agrees with Schaffer that the per share exercise price was fixed and not floating because it was tied to the public announcement of the execution of the 1998 PSA or Lasersight's 1997 fourth quarter financials, the Court observes that the Alternate Plan was contingent on rejection of the Repricing, and therefore could not have been adopted until June 12, 1998 at the earliest. Thus, Lasersight's redemption of all of Defen-

dants' Preferred Stock by June 5, 1998 prevented the Alternate Plan from being executed, which demonstrates that there was no guarantee that the Alternate Plan would be used and the warrants issued to Defendants. Therefore, the Court is not persuaded that the existence of the Alternate Plan means that the 1998 PSA can be matched with Defendants' sales of Common Stock.

### III. CONCLUSION AND ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the motion of defendants CC Investments, LDC and Castle Creek Partners, L.L.C. for partial summary judgment is DENIED; and it is further

**ORDERED** that the motion of defendants Societe Generale, Shepherd Investments International, Ltd., Stark International, Brian Stark, and Michael Roth for summary judgment is DENIED.

**SO ORDERED.**