AT HOME CORPORATION, Plaintiff,

v.

COX COMMUNICATIONS, INC., Cox@home, Inc., Comcast Corporation, Comcast Online Communications, Inc., Comcast PC Investments Inc., Brian L. Roberts, David M. Woodrow, Defendants.

No. 03 Civ. 8094(NRB).

United States District Court, S.D. New York.

Aug. 17, 2004.

Joseph S. Allerhand, Esq., Weil, Gotshal & Manges LLP, New York City, for Plaintiff.

Sheron Korpus, Esq., White & Case LLP, New York City, Michael D. Hays, Esq., Dow, Lohnes & Albertson, PLLC, Washington, DC, for Defendants.

## AMENDED MEMORANDUM AND ORDER

BUCHWALD, United States District Judge.

Plaintiff At Home Corporation has brought this action against defendants Cox Communications, Inc., Cox@home, Inc. (collectively, "Cox"); Comcast Corporation, Comcast Online Communications, Inc., Comcast Pc Investments Inc. (collectively, "Comcast"); Brian L. Roberts; and David M. Woodrow, asserting two causes of action for insider "short swing" profits in violation of § 16(b) of the Securities Exchange Act of 1934 and a third cause of action for breach of fiduciary duty. Now pending are motions by defendants Comcast and Cox to dismiss the two § 16(b) causes of action. We heard oral argument on defendants' motions on June 16, 2004. For the reasons set forth below, defendants' motions are granted.

## BACKGROUND

At Home was founded by cable companies to provide cable-based high-speed internet access to customers. According to the complaint, during the relevant period, defendants Cox and Comcast collectively owned more that ten percent of the outstanding shares of At Home Series A common stock and acted as a group, thereby qualifying as "insiders" subject to trading restrictions. The other controlling shareholder was Tele–Communications, Inc., which was acquired by AT & T on June 23, 1998.

The transactions giving rise to plaintiff's § 16(b) causes of action were, according to the complaint, part of an effort by AT & T to expand its control over At Home. Compl. ¶ 40. On March 28, 2000, AT & T, Cox and Comcast entered a letter agreement ("the Agreement") under which defendants acquired certain puts (rights to sell shares) ("the Puts"). Specifically, Cox acquired the right to sell At Home shares to AT & T for up to $1.4 billion, and Comcast acquired the same right up to $1.5 billion. Opp'n, Ex. B. Although the number of shares to be sold was not fixed, the Agreement specified a share price containing a fixed and a floating component. *Id.* Specifically, defendants acquired the right to sell their shares to AT & T for "the greater of (1) $48 and (2) the average per share trading price ... during the 30 consecutive trading day period beginning 15 trading days immediately prior to ... AT & T's receipt of the notice of exercise of the Put." *Id.*

Around the time when defendants reached the above agreement with AT & T, defendant Comcast acquired several cable companies by stock purchase: Garden State Cablevision, L.P. (January, 2000); Jones Intercable, Inc. (March, 2000); and Prime Communications–Potomac, LLC and Chicago, LLC (August, 2000). These companies collectively owned warrants to purchase approximately 8.9 million shares of At Home.

On January 11, 2001, defendants notified AT & T of their intention to exercise their Puts, in two nearly identical letters. Opp. Exs. C and D. Defendants stated that "[b]ased on current market conditions, [they had] assumed that the purchase price under the Put [would] be $48 per share." *Id.* At that time, At Home common stock shares were selling at $7.72. According to the complaint, because AT & T faced enormous tax liabilities if it purchased defendants' shares, the parties entered into a new agreement on May 18, 2001 whereby defendants canceled the Puts in exchange for 155.3 million shares of AT & T stock, at that time worth 3.43 billion. Compl. ¶ 56. As a result of this modified agreement, Comcast recorded a pre-tax gain of $296.3 million and Cox

recorded pre-tax gain of $307.4 million. *Id.* at ¶ 57.

This action followed.

## DISCUSSION

### I. Legal Standard

In considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), we accept as true all material factual allegations in the complaint, *Atlantic Mutual Ins. Co. v. Balfour Maclaine Int'l, Ltd.,* 968 F.2d 196, 198 (2d Cir.1992), and may grant the motion only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Still v. DeBuono,* 101 F.3d 888, 891 (2d Cir.1996); *see Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). At the same time, we are not required to accept any legal conclusions contained in the complaint. *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Joint Council, etc. v. Delaware L. & W. R.R.,* 157 F.2d 417, 420 (2d Cir.1946).

In addition to the facts set forth in the complaint, we may also consider documents attached thereto and incorporated by reference therein, *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.,* 155 F.3d 59, 67 (2d Cir.1998), as well as matters of public record, *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 75 (2d Cir.1998), *cert. denied,* 525 U.S. 1103, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999).

### II. Section 16(b) of the Exchange Act

Section 16(b) of the Exchange Act[1] provides that "a beneficial owner of more than ten percent of any class of equity security must turn over any profits earned, regardless of intent, from a purchase and sale of the securities occurring within six months." *Global Intellicom, Inc. v. Thomson Kernaghan & Co.,* 1999 WL 544708, *13 (S.D.N.Y. July 27, 1999). The purpose of the statute is to "prevent[ ] the unfair use of *information* " which such beneficial owners, as well as officers and directors, are presumed to possess "by reason of [their] relationship to the issuer." 15 U.S.C. § 78p(b) (emphasis added). Thus, § 16(b) is *not* aimed at any benefits (such as plaintiff implies defendants derived) from an insider's market *power.*

■ Because § 16(b) is a strict liability penalty (applying regardless of whether the insider actually used its access to inside information), the Supreme Court has expressed a "reluctan[ce] to exceed a literal, "mechanical" application of the statutory text in determining who may be subject to liability, even though in some cases a broader view of statutory liability could work to eliminate an 'evil that Congress sought to correct through § 16(b).' " *Gollust v. Mendell,* 501 U.S. 115, 122, 111 S.Ct. 2173, 115 L.Ed.2d 109 (1991) (quotation omitted).

### III. Plaintiff's Causes of Action

#### A. First Cause of Action

Plaintiff's first cause of action alleges that § 16(b) requires defendants to disgorge the profits they made by creating the Puts and then canceling them.

At issue is the character of the Agreement under § 16(b). In 1991, the SEC

---

1. Section 16(b) reads in pertinent part:

For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner ... any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer ... within any period of less than six months ... shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner ... in entering into such transaction or holding the security purchased or of not repurchasing the security sold for a period exceeding six months.

amended its rules to provide that the acquisition of "derivative" securities, *i.e.*, instruments that derive their value from the value of the underlying stock, falls within § 16(b). 17 C.F.R. § 240.16a–1(d). The securities acquired by defendants through the Agreement were a type of derivative: an option to sell At Home shares at some future date (also known as a "put").[2] Under SEC regulations, while the establishment of a put is a § 16(b) "sale," *see* 17 CFR § 240.16b–6, the *disposition* of underlying securities *at a fixed exercise price* due to the *exercise* of a put equivalent position shall be exempt from the operation of section 16(b) ..." 17 C.F.R. § 240.16b–6(b) (emphasis added).

Sections § 240.16b–6 and 240.16b–6(b) conform to the purpose of § 16(b) because they target the point in the transaction series when the threat of insider trading is greatest. Just as, under the traditional scenario, an insider who learns of an imminent dip in stock value might sell his shares and then repurchase them at a profit once the stock dips, that same insider might achieve the same results by purchasing fixed-price puts.[3] By contrast, an insider with the same information who already possesses puts need not trade on the information because his sale price is already locked in and will not be affected by the imminent dip; for this reason, the *exercise* of a fixed-price option is a nonevent under § 16(b).

The calculation is different for another common type of derivative: the "floating price" derivative, or option to buy or sell at a price keyed to the market price at the time of exercise. This type of option does not pose a risk of insider trading at the time of its creation because it does not lock in a price that may profitably diverge from the market price (*i.e.*, once the inside information reaches the market). Instead, the greatest risk occurs when a holder *exercises* floating options. For example, if Company A, an insider of company B, holds options to buy shares of Company B at 95 percent of their market price and later learns that the price of B stock is about to briefly surge, A may exercise its right, and then promptly resell its shares just after the surge.

The SEC has responded to the different risks posed by floating-price derivatives by interpreting § 16(b) such that

> a right with a floating exercise price is not required to be reported and will not be deemed to be acquired or purchased, for Section 16 purposes, until the purchase price of the underlying securities becomes fixed or established, which commonly occurs at exercise. Thus, a right to purchase an equity security is deemed acquired as of the date the exercise or conversion price becomes fixed, and the acquisition, absent an exemption, would be matchable for Section 16(b) purposes with a disposition within six months of the fixing of the price.

*Ownership Reports and Trading By Officers, Directors and Principal Security Holders*, Exchange Act Release No. 28869 [1990–1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 84,709, at 81,265(Feb. 8, 1991).

The question presented by the instant case, which has been addressed (in defen-

---

**2.** A put derives its value *inversely* from the value of the underlying stock. That is, as the value of the stock declines, the value of the option to sell that stock at a pre-fixed price increases.

**3.** As the Second Circuit explained in *Magma Power Co. v. Dow Chemical Co.*, 136 F.3d 316,

322 (2d Cir.1998), "[i]n essence, an insider who takes an option position is making a bet on the future movement of the price of the underlying securities; the odds in the insider's favor are foreshortened if the wager is backed by inside information."

dants' favor) by three courts of this district, *see infra,* but which has not yet been addressed by the Second Circuit, is how to apply § 16(b) to options containing both a fixed and a floating component ("hybrids"). Plaintiff's first cause of action alleges that § 16(b) requires defendants to disgorge the profits from their May 18, 2001 agreement to cancel their puts because this purchase-equivalent transaction occurred within six months of defendants' sale-equivalent decision on February 11, 2001 to *exercise* the Puts. Defendants move for dismissal of this cause of action on the ground that, even if all the facts alleged in the complaint were true, the sole proper § 16(b) sale-equivalent event would still be the March 28, 2000 *creation,* not the exercise, of the Puts.[4] We agree.

As noted earlier, defendant's characterization of the Puts is supported by the three opinions of this Court that address the question of how to treat hybrid options under § 16(b).[5] In *Lerner v. Millenco,* 23 F.Supp.2d 337 (S.D.N.Y.1998), the interest consisted of certain debentures convertible into common stock under a hybrid pricing structure. Specifically, the debentures were convertible at the lesser of "(1) 80 percent of the average of the closing price of EA common stock as traded on the New York Stock Exchange on the five days

immediately preceding the date on which the holder provided EA with notice of conversion; or (2) $4.00 per share." *Id.* at 339. Lerner argued that, even though defendants had exercised their options under the fixed price, the options more closely resembled floating options and therefore the date of their *exercise* should be deemed a § 16(b) event. The court rejected this argument, finding that the hybrid options at issue functioned more like fixed options because they could be acquired for the purpose of locking in a minimum profit at the time of creation. Accordingly, the court found that defendants' exercise of their options was not a § 16(b) event.

Judge Schwartz, in *Levy v. Oz Master Fund, Ltd.,* No. 00–7148(AGS), 2001 WL 767013 (S.D.N.Y. July 9, 2001), reached the same conclusion with respect to preferred stock which was convertible to common stock under a hybrid pricing structure. The court found that, regardless of whether the options were ultimately exercised under the floating rate or the fixed rate,[6] the creation of the options was *the* sole § 16(b) event. *Id.* at *8. As in *Lerner,* the *Oz* court viewed the ability to lock in a profit at the creation of the options as far more significant, and therefore worthy of § 16(b) treatment, than any presumed enhancement of profits when hybrid options are exercised at the floating rate.

---

4. The following chart may clarify the sequence of events:

| Date | Event |
| --- | --- |
| March 28, 2000 | The Puts are created. |
| February 11, 2001 | Defendants notify AT & T of their decision to exercise the Puts. |
| May 18, 2001 | Defendants agree to cancel the Puts in exchange for AT & T stock. |

5. We are wholly unpersuaded by plaintiff's argument that, because the Agreement specified as the per share price "the greater of (1) $48 *and* (2) the average per share trading

price ... during the 30 consecutive trading day period beginning 15 trading days immediately prior to ... [defendants'] exercise of the Put" (emphasis added), and the agreements at issue in the other cases use the term "or" to connect the fixed and floating price-components, these cases are thereby distinguishable. *See* Opp'n at 24–26. This linguistic distinction is an empty one; the phrase "the greater of X *and* Y," whether or not it is grammatically correct, is clearly meant to express the same thing as "the greater of X *or* Y," because there is no other logical interpretation.

6. In *Oz,* defendants had exercised their option under the floating rate.

Since *Lerner* and *Oz*, the SEC has provided guidance on the treatment of hybrid instruments in an amicus brief submitted in *Levy v. Southbrook Intern. Investments, Ltd.*, 263 F.3d 10 (2d Cir.2001) (00–7630).[7] Although the SEC did not specify exactly how to apply § 16(b) to hybrids, the SEC did explain that

> [The defendant] acquired an indirect pecuniary interest in that minimum number of common shares at the time [the defendant] acquired the convertible preferred stock. However, [the defendant] would not acquire a pecuniary interest *in any additional shares* of common stock through the convertible preferred stock before its conversion, at which time the conversion price would fix to determine what—if any—additional shares of common would be obtained through the floating price component.

(Emphasis added.)

This characterization suggests that the proper way to treat hybrids under § 16(b) is as two separate transactions. The first transaction, the creation of the interest, is equivalent to fixed price options, and is always a § 16(b) event. The second transaction is a theoretical modification of the fixed price, but the *value* of this modification is measured as the difference between the initial fixed price and the exercise price. Where the initial fixed price *becomes* the exercise price (because it is more advantageous than the floating price), the date of exercise has no § 16(b) significance.[8]

At least one other judge in this Court has read the SEC brief in this way. *See Schaffer ex rel. Lasersight Inc. v. CC Investments, LDC*, 280 F.Supp.2d 128, 139–140 (S.D.N.Y.2003) ("[U]nder the SEC's reasoning, the acquisition (or disposition) of a hybrid instrument results in (1) an immediate acquisition (or disposition) of a derivative security with respect to the minimum number of shares of underlying common stock that can be acquired under the fixed rate component, and (2) a subsequent purchase (or sale) at the time of conversion of any *additional* shares acquired (or disposed of) at that time under the floating rate component.") (emphasis added).

This reading also comports with the language of 17 C.F.R. § 240.16b–6(b), which exempts from § 16(b) "the *disposition* of underlying securities at *a* fixed exercise price due to the exercise of a put equivalent position" (emphasis added), without requiring that the price be fully fixed from the moment the put is created.

█ In the instant case, it is undisputed that, at the time defendants exercised their options, the floating price was irrelevant because it was far below the fixed minimum of $48 per share. Plaintiff argues that we should nonetheless treat the interest in this case as a purely floating derivative because the initial Puts agreement, while it fixed a maximum overall price and a minimum price-per-share, never fixed the precise number of shares to be sold.[9] However, this characterization is

---

7. Although the brief clarified the SEC's position on hybrids, this issue was not ultimately the basis for the Second Circuit's holding.

8. This conclusion is fully consistent with the holding of the primary case relied on by plaintiff, *Levy v. Clearwater Fund IV, Ltd.*, No. 99–004(SLR), 2000 WL 152128 (D.Del. Feb. 2, 2000), as in that case, unlike here, defendants exercised their options at the *floating* price, *id.* at *2.

9. During oral argument, plaintiff stressed, as further support for their position, that the structure of the Agreement was such that defendants could not have completed the SEC disclosure form, Form 4, which insiders are required to file for any purchase or sale of stock, because the Agreement did not specify an exact price-per-share (a required category of the Form 4). Tr. 3–5. However, as we pointed out at oral argument, *any* hybrid derivative would give rise to the same problem.

misleading. The specified maximum overall price of $2.9 billion, when combined with the specified minimum per-share price of $48, dictated that defendants could sell, at most, 60.4 million shares. Thus the initial agreement *did* limit the number of shares which AT & T would be required to buy. Moreover, plaintiff has not offered any policy reason for treating hybrids differently depending on whether they specify a maximum number of shares or a maximum overall price, or for targeting the exercise of options under the fixed-price component.[10]

For these reasons, we find that neither defendants' January 11, 2001 decision to exercise their Puts nor the February 2, 2001 date on which the (by then irrelevant) floating price component became fixed qualifies as a § 16(b) event. Thus, the only sale-equivalent event was the March 28, 2000 Agreement, which occurred more than six months before the only conceivable purchase-equivalent event: the May 18, 2001 cancellation of the Puts. As plaintiff's first cause of action fails to identify matching transactions occurring within six months of each other, defendants' motions to dismiss the first cause of action are granted.

## B. Second Cause of Action

■ As an alternative to its first cause of action, plaintiff has pled that the creation of the Puts can be matched, under § 16(b), with defendant Comcast's purchase of several cable companies that themselves possessed warrants to purchase At Home stock. As set forth *supra*, around the time when defendants entered the Agreement with AT & T, Comcast acquired, through stock purchases, three cable companies: Garden State Cablevision, L.P. (January, 2000); Jones Intercable, Inc. (March, 2000); and Prime Communications–Potomac, LLC and Chicago, LLC (August, 2000). These companies collectively owned warrants to purchase approximately 8.9 million shares of At Home. The second cause of action is only against Comcast, not Cox.

As used in § 16(b), "[t]he terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire" any equity security. 15 U.S.C. § 78c(a)(13). Whether this definition covers the situation in which Company A, an insider of Company B, buys Company C, and among the assets of Company C are warrants to purchase Company B shares, appears to be an issue of first impression.[11] We agree with defendants that, if anything,

Tr. 33. Moreover, as defendants observed, *see id.*, this problem is not insurmountable. Since a Form 4 filed at the time a hybrid is created is required because of the danger that an insider might be locking in a *minimum* profit via the fixed-price-component, it is *that* component which is the relevant price-per-share and which therefore should be disclosed on the form. In this case, therefore, defendants could have filed an effective Form 4 specifying $48 as the price-per-share.

10. During oral argument, we repeatedly asked plaintiff to articulate a scenario in which the floating component, though practically irrelevant at the time of exercise, created a risk of short-swing insider trading. Plaintiff was unable to do so. Tr. 34–35, 41–42, 61–63. Judge Schwartz asked the same

question in *Levy*, and concluded that "from the perspective of Rule 16(b), the security with the hybrid conversion feature is no different from a security with a fixed price option when the market price is below the fixed conversion price." *Levy*, 2001 WL 767013, at *7.

11. Plaintiff obscures this dearth of authority by citing to cases in which an insider specifically and directly purchased warrants for the subject company from a third company. *Magma Power Co. v. Dow Chemical Co.*, 136 F.3d 316, 322 (2d Cir.1998); *Morales v. Mapco, Inc.*, 541 F.2d 233, 236 (10th Cir.1976), *cert. denied sub nom. Ross v. Morales*, 429 U.S. 1053, 97 S.Ct. 768, 50 L.Ed.2d 770 (1977). Such cases are totally inapposite to the facts at hand.

this absence of precedent favors them. It is unlikely that, until now, no insider has gained warrants to purchase stock in a company (in the manner described above) within six months of selling (or engaging in a sale-equivalent transaction involving) shares of the company.

"In deciding whether borderline transactions are within the reach of the statute, the courts have come to inquire whether the transaction may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information." *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 594, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973). We can conceive of situations where an insider could acquire one company simply (or mainly) to obtain its interests in the subject company, as when the acquired company has few other assets or exists for the sole purpose of trading in shares of the subject company. However, plaintiff has failed to plead any facts giving rise to such a possibility here.

According to the complaint, Comcast's purchases yielded warrants to purchase approximately 8.9 million shares of At Home. It is undisputed that Comcast paid nearly $10 *billion* to acquire the cable companies, and that Comcast was previously a part owner of one company, a controlling shareholder of another, and a creditor of the third. Korpus Dec. Ex. C. It is also undisputed that, during the period in which Comcast inherited these warrants, At Home's share price was in the range of $13.31 to $43.44. *Id.* Ex. A.[12]

Given these undisputed facts, we can conceive of no set of further facts which would demonstrate that the transactions were of a type warranting § 16(b)'s presumption of abuse. Accordingly, Comcast's motion to dismiss plaintiff's second cause of action is granted.[13]

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss plaintiff's first and second causes of action are granted. The parties are directed to appear for a conference in Courtroom 21A on September 9, 2004 at 11:30 a.m.

**SO ORDERED.**

---

**12.** Given the figures involved, it is inconceivable that Comcast could have purchased these companies for their warrants. For present purposes, we will assume that the warrants were extremely valuable, *e.g.*, were warrants to purchase shares for $1. These warrants would then have been worth approximately $27.38/share, as the average between the trading high and low during that period was $28.38. Their overall value would then have been $243.64 million, less than 3% of the price Comcast paid for the cable companies.

**13.** Because we agree with defendants on the merits, we need not reach defendants' argument that the second cause of action is not timely. We note, however, that had we agreed with plaintiffs that defendants' acquisition of the cable companies was a § 16(b) event, the recently decided Second Circuit opinion *Litzler v. CC Investments, L.D.C.*, 362 F.3d 203, 205 (2d Cir.2004), which holds that the two-year statute of limitations is tolled whenever a defendant fails to comply with § 16(b) disclosure requirements, would seem to apply.