**AT HOME CORPORATION,**
Plaintiff–Appellant,

v.

**COX COMMUNICATIONS, INC., Cox @ Home, Inc., Comcast Corporation, Comcast Online Communication, Inc., Comcast PC Investments, Inc., Brian L. Roberts and David M. Woodrow,** Defendants–Appellees.

**Docket No. 05–0115 CV.**

United States Court of Appeals, Second Circuit.

Argued: Oct. 17, 2005.

Decided: April 28, 2006.

**404**

Joseph S. Allerhand (Richard W. Slack, Etan Mark, on the brief), Weil, Gotshal & Manges LLP, New York, NY, for Plaintiff–Appellant At Home Corporation.

Michael D. Hays (Michael D. Rothberg, Daniel D. Prichard, on the brief), Dow, Lohnes & Albertson, PLLC, Washington, DC, for Defendants–Appellees Cox Communications, Inc. and Cox @ Home, Inc.

Sheron Korpus, (James T. Cain, on the brief), White & Case, LLP, New York, NY, for Defendants–Appellees Comcast Corporation, Comcast Online Communication, Inc., Comcast PC Investments, Inc., and Brian L. Roberts.

Brian G. Cartwright, General Counsel of the Securities and Exchange Commission (Jacob H. Stillman, Solicitor, Eric Summergrad, Deputy Solicitor, Allan A. Capute, Special Counsel to the Solicitor), Washington, DC, for Amicus Curiae Securities and Exchange Commission.

Before: JACOBS, CABRANES, and SACK, Circuit Judges.

DENNIS JACOBS, Circuit Judge.

This appeal raises two questions under section 16(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78p(b) (2005), which provides for disgorgement of short-swing profits earned by an insider who buys and sells the issuer's equity securities within six months. The questions concern the applicability of section 16(b) to: [i] a hybrid transaction involving a fixed and floating price component; and [ii] a purchase of a company holding warrants in the issuer within six months of the granting of a put. The transaction that gives rise to these questions took place when American Telephone & Telegraph ("AT & T"), as holder of a large block of shares in At Home Corp., granted a put to two companies—Cox Communications and Comcast Online Communications—whose holdings in At Home were an impediment to AT & T's exercise of effective control over that company. The exercise price was the greater of $48 or the 30–day trading average of At Home shares for the 15 days before and 15 days after exercise of

the put; the maximum number of shares was the number that could be bought at the exercise price for a specified (enormous) dollar amount. Within six months of the granting of the put, Comcast purchased three cable systems that held warrants for At Home stock (among other considerable assets).

In count one of the complaint, At Home as plaintiff seeks disgorgement on the theory that a section 16(b) sale occurred at exercise for these put options. The district court dismissed this claim, identifying the grant of the hybrid option as the relevant section 16(b) event, *At Home Corp. v. Cox. Commc'ns, Inc.*, 340 F.Supp.2d 404, 410 (S.D.N.Y.2004), and we agree. In count two, At Home seeks disgorgement on the theory that an acquisition of a third-party company should be treated as a section 16(b) purchase when the acquisition target owned warrants to purchase stock of the issuer. The district court declined to match shares of different issuers to impose section 16(b) liability. *Id.* at 411. Although we disagree with the district court's reasoning with respect to this count, we conclude that in the context of this case there was no matching sale and purchase. We therefore affirm.

## BACKGROUND

■ Because the district court dismissed the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), all facts are construed in At Home's favor. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002).

### A

At Home Corporation ("At Home") was a provider of "always on" high-speed internet to home users. Cox and Comcast,

which allegedly acted together as a "group," *see* 15 U.S.C. § 78m(d), collectively owned more than 17 percent of At Home's outstanding common stock. By June 1998, AT & T owned 35 percent of At Home's common stock. Although AT & T held the largest block of At Home stock, Cox and Comcast together could prevent AT & T from unilaterally controlling At Home's board of directors.

To consolidate its control of At Home, AT & T granted put options to Cox and Comcast.[1] A letter agreement entered March 28, 2000 ("Letter Agreement") set out the options' terms:

> AT & T grants to each of Cox and Comcast the right to put to AT & T ... exercisable at any time ... from January 1, 2001 through June 4, 2002, up to an aggregate number of shares of [At Home] stock ... equal to the Maximum Number.... [T]he "Maximum Number" with respect to Cox will be a number of [shares] having an aggregate purchase price under the Put equal to $1,397,500,800 and the "Maximum Number" with respect to Comcast will be a number of [shares] having an aggregate purchase price under the Put equal to $1,500,152,640....

> The per share purchase price under the Put will be the greater of (1) $48 and (2) the average per share trading price of the [shares] on the Nasdaq ... during the 30 consecutive trading day period beginning 15 trading days immediately prior to and ending 15 trading days immediately following AT & T's receipt of the notice of exercise of Put.

The Letter Agreement grants a "hybrid option," because the pricing formula has both fixed and floating components. The fixed component sets the exercise price at

---

1. A "put option" is the right to sell a security at a specified price. *Magma Power Co. v.*

*Dow Chem. Co.*, 136 F.3d 316, 321 n. 2 (2d Cir.1998)

$48 per share if the options are executed while At Home is trading below $48 per share; if At Home shares trade consistently above $48 per share, the exercise price is calculated using the floating price mechanism. In either event, the total sale price is capped by the "maximum number": $1.4 billion for Cox and $1.5 billion for Comcast. (At Home contends, erroneously, that the fixed aggregate transaction amount means that there was no real fixed-price component.[2])

Comcast and Cox exercised the put options on January 11, 2001. This opened the 30–day window during which At Home's share price would be tracked for comparison to the $48 dollar price in order to determine both the final per-share price and the number of shares to change hands. Because At Home shares traded well below the $48 per share guaranteed price ($7.72 on January 11, 2001 to $6.00 on February 2, 2001), the exercise price was calculated at the $48 fixed price.

At Home argues that, for the purposes of section 16(b), the sale date was the exercise date (January 11, 2001), in which case Cox and Comcast would each be liable for profits earned on any At Home shares purchased between July 11, 2000 and July 11, 2001. Cox and Comcast argue (and the district court agreed) that because the Letter Agreement option was exercised at the fixed price, the date of sale for the purposes of section 16(b) was the date that the option was granted.

### B

If the section 16(b) sale occurred as of the granting of the Letter Agreement option, it is undisputed that At Home's short-swing insider trading claim fails as to Cox: Cox purchased no shares of At Home in the six months before or after the date on which the option was granted. As to Comcast, however, At Home asserts in the alternative a theory of liability that treats the grant of the option as a sale, and would match that sale with Comcast's purchase of three cable systems whose holdings included warrants to purchase At Home stock.

Between January and August 2000, Comcast acquired three cable systems (Prime Communications, Jones Intercable, and Garden State Cablevision) for approximately $10 billion. The acquired companies allegedly held warrants to purchase 8.9 million shares of At Home stock, and the acquisitions thus had the effect of placing those warrants in Comcast's hands. *At Home Corp. v. Cox Commc'ns., Inc.*, 340 F.Supp.2d 404, 411 (S.D.N.Y.2004). At Home argues that these acquisitions satisfy the purchase requirement of section 16(b).

### DISCUSSION

The district court dismissed both claims pursuant to Fed.R.Civ.P. 12(b)(6). *At*

---

**2.** At Home argues that "the *only* fixed component at issuance was not the number of shares or price per share, but the *total consideration* to be paid by the grantor of the option (AT & T)." Appellant's Br. at 27 (emphasis in original). As the district court noted, this argument is spurious. As with many hybrid options containing floating and fixed price components, the Letter Agreement options contained a possible fixed price ($48 per share) payable depending on the market price at the time of exercise. The prospect of

a higher exercise price does not mean that there is no fixed-price component; the prospect of a higher exercise price is what makes the option a "hybrid" in the first place. The maximum number of shares is likewise fixed: Where the put specifies both the maximum total payment and the fixed price per share, the number of shares in the transaction is fixed by long division—the maximum compensation divided by $48 per share equals the maximum numbers of shares to be sold at the fixed-price.

*Home Corp. v. Cox. Communications, Inc.,* 340 F.Supp.2d 404 (S.D.N.Y.2004). In dismissing count one, the district court reasoned that the *grant* of a hybrid option—rather than its *exercise*—is the only relevant section 16(b) event if the option is eventually exercised pursuant to the fixed-price mechanism. In dismissing count two, the district court applied the "unorthodox transaction" rule of *Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973), and determined that in the absence of any showing of manipulative intent, a sale of shares in one company cannot be matched for section 16(b) purposes with a purchase of shares in another company, regardless of the holdings of either company.

We review *de novo. Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir. 2002).

## I

■ Section 16(b) of the Securities Exchange Act of 1934 requires insiders to disgorge profits earned in short-swing trading:

> For the purpose of preventing the unfair use of information which may have been obtained by [an insider] by reason of his relationship to the issuer, *any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer ... within any period of less than six months ... shall inure to and be recoverable by the issuer, irrespective of any intention* on the part of such [insider] in entering into such transaction ....

15 U.S.C. § 78p(b) (2005) (emphasis added). Section 16(b) operates mechanically, with no required showing of intent, *see Steel Partners II, L.P. v. Bell Indus., Inc.,*

315 F.3d 120, 123 (2d Cir.2002), but as applied to complex financial arrangements (such as hybrid options), the mechanism has wheels within wheels. When one transaction is a put option, there are two alternative potential dates of sale: the acquisition date and the date of execution.

In 1991, the SEC promulgated new rules to answer section 16(b) questions posed by options. As to options with fixed price components, the SEC is of the view that the greatest risk of short-swing profiteering arises at the point in time nearest the establishment of the option. *See Ownership Reports and Trading By Officers, Directors and Principal Securities Holders,* Exchange Act Rel. No. 28869. 56 Fed.Reg. 7242, 7250, 7253 (Feb. 21, 1991); *see also, At Home v. Cox Commc'ns, Inc.,* 340 F.Supp.2d 404, 410 n. 10 (S.D.N.Y. 2004). The SEC's 1991 amendments to Rule 16b–6(a) account for that risk by providing that "*the establishment* of ... a put equivalent position ... shall be deemed a sale of the underlying securities for purposes of section 16(b) of the Act." 17 C.F.R. § 240.16b–6(a) (2005) (emphasis added). Correspondingly, under Rule 16b–6(b), "*the disposition* of underlying securities *at a fixed price* due to the exercise of a put equivalent position shall be exempt from the operation of section 16(b) of the Act." 17 C.F.R. § 240.16b–6(b) (emphasis added). Read together, the two rules treat the *acquisition* date of a put as the only sale date if the option is ultimately exercised according to a fixed price mechanism.

These rules decide this case. Comcast and Cox exercised their put options at the $48 fixed price. These options were "put equivalent positions" within the meaning of SEC rules.[3] The floating price mechanism

---

**3.** The SEC rules define a "put equivalent position" as "a derivative security position that

increases in value as the value of the underlying equity decreases, including, but not limit-

did not affect the calculation of the exercise price.[4] Thus, the section 16(b) sale in this case occurred only with the acquisition of the letter agreement options, dated March 28, 2000. Cox, having purchased no shares of At Home within six months of this date, is therefore not liable under section 16(b).

## II

At Home alleges in the alternative—against Comcast only—that (for the purposes of section 16(b)) Comcast purchased shares of At Home by acquiring three cable systems whose assets included warrants to purchase At Home stock. It is an issue of first impression in the federal courts whether an insider's acquisition of stock in the issuer *by acquisition of a third-party intermediary company* gives rise to section 16(b) liability for short-swing profits (when matched with a sale of the issuer's stock).

## A

The district court treated indirect acquisition as a "borderline transaction" within the meaning of *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 594, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973), and therefore analyzed whether such transactions serve as a "vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information." *Id.* This analysis was misplaced. *Kern County* pre-

sented a borderline case because—although Occidental owned more than 10 percent of Kern County shares, and sold and purchased Kern County shares within six months—Occidental was an atypical insider in two ways: (i) it lacked access to inside information and (ii) its shares were sold involuntarily. *Id.* at 596–598, 600, 93 S.Ct. 1736. Section 16(b) liability was inappropriate because the Supreme Court saw "nothing ... to indicate either the *possibility of inside information* being available to Occidental ... or the *potential for speculative abuse* of such inside information." *Id.* at 599, 93 S.Ct. 1736 (emphasis added). This Circuit has suggested that these factors—an involuntary transaction by an insider having no access to inside information—are prerequisites to use of the *Kern County* analysis. *See American Standard, Inc. v. Crane Co.*, 510 F.2d 1043, 1054–55 (2d Cir.1974).

At Home presents a novel theory of insider purchasing; but novelty alone does not justify resort to *Kern County*'s "borderline transaction" framework. *Kern County* controls when the insider is atypical as well as the transaction. Comcast, however, was a garden-variety insider. *Kern County* therefore does not resolve this case.

## B

Section 16(b) speaks of matching transactions in the equity securities of one issuer, and disgorging "any profit realized

---

ed to, *a long put option.*" 17 C.F.R. § 240.16a–1(h) (emphasis added). Thus, the term specifically covers put options such as those involved in this case. Additionally, the puts at issue here are within the definition because their value increased as the value of At Home shares decreased: with a locked-in sale price, the option holders realized profit as At Home declined in price.

4. We need not consider the § 16(b) ramifications of an option exercised according to a floating price mechanism. Judges of the Southern District of New York have taken varying approaches to this question. *Compare Lerner v. Millenco, L.P.*, 23 F.Supp.2d 337 (S.D.N.Y.1998) (treating acquisition of put option as only § 16(b) sale) *with Schaffer v. CC Invs., LDC*, 280 F.Supp.2d 128 (S.D.N.Y.2003) (treating floating-price exercise as second § 16(b) event).

... from any purchase and sale, or any sale and purchase, of *any equity security of such issuer*." 15 U.S.C. § 78p(b) (2005) (emphasis added). Use of the singular ("any equity security" and "such issuer") supports an inference that a transaction in the equity securities of one company cannot be matched with a transaction in the equity securities of another. That inference is reinforced by Congress's intent that the statute "be simple and arbitrary in its application." *Whiting v. Dow Chem. Co.*, 523 F.2d 680, 687 (2d Cir.1975).

The Securities and Exchange Commission ("SEC"), as *amicus curiae*, argues that the same result is compelled by contrasting [i] the "evils of insider trading" that concerned Congress, *see Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972), with [ii] the risks that arise when the issuer's stock is acquired indirectly by merger with another company.[5] SEC Br. at 12–14. The SEC reminds us that Congress enacted section 16(b) out of concern for the "class of transactions in which the possibility of abuse was believed to be intolerably great." *Id.* at 12 (quoting *Kern*, 411 U.S. at 592, 93 S.Ct. 1736 (internal citations omitted)). The SEC (an agency uniquely experienced in confronting short-swing profiteering) convincingly argues that a typical change-of-control transaction does not present an intolerable risk of abuse:

An insider who seeks to profit from inside information typically will engage in a purchase or sale in the issuer's securities, and then engage in an opposite-way transaction when the information becomes public, and the securities' price is affected. A change in control, however, is typically motivated by a desire to acquire control of a company. It also involves complex negotiations, and many strategic corporate considerations, and often involves regulatory review and approval. While it is not beyond possibility that an acquiror would tailor a change in control transaction to obtain short-swing profits from insider trading, it is certainly not going to be a common scenario. *Good faith change in control transactions are not ones "in which the possibility of abuse [is] intolerably great."*

*Id.* at 13–14 (emphasis added; emendation in original).

No one seeking an insider's edge speculating in the shares of an issuer would pursue that advantage by acquiring other companies if no more than a small fraction of the purchase price could be (notionally) attributed to the shares of the issuer. It would be like speculating in tractors by buying a farm.

The acquisition of three operating cable systems for $10 billion entails great risk and high transaction costs. *See* Carol B. Swanson, *The Turn in Takeovers: A Study in Public Appeasement and Unstoppable Capitalism*, 30 Ga. L.Rev. 943, 954–55 (1996) (estimating transaction costs in leveraged buyout to reach "four percent of the company's purchase price and more than five percent of the market value at the time of the offer"); Louis Lowenstein, *Opinion*, 2 Merger & Acquisitions L. Rep. 427, 430 (1989) (estimating transaction costs as four to five percent of acquisition price, regardless of the size of the deal); *see also* Robert Smiley, *Tender Offers, Transaction Costs and the Theory of the Firm*, 58 Rev. Econ. & Stat. 22, 29–30

---

5. The SEC claims that this Court "owes controlling deference to the ... interpretation of ... Section 16(b) ... provided in [the SEC's] *amicus* brief." SEC Br. at 18. Because we are persuaded by the SEC's argument, we need not decide whether the *amicus* brief would otherwise command deference.

(1976) (calculating median transaction costs at over *thirteen percent* of post-tender offer market value). As the district court observed, Comcast's maximum profit from the indirect purchase of At Home warrants would constitute less than five percent of the price Comcast paid for the cable companies. *See At Home*, 340 F.Supp.2d at 411 n. 12.

■ We cannot generalize from the risk calculus of the particular transactions at issue on this appeal. We appreciate that indirect purchasers may on occasion seek to take advantage of inside information, and may succeed in doing so. However, "while there may be evils to be redressed arising out of [a] kind of corporate maneuvering, § 16(b) is simply not an antidote to all the ills that may plague the securities market." *Heublein, Inc. v. Gen. Cinema Corp.*, 722 F.2d 29, 31 (2d Cir.1983). The various prohibitions on insider trading work together: The more a transaction is crafted to evade section 16(b), the stronger the case for holding an insider liable under section 10(b). Moreover, a different analysis may control if an indirect sale or purchase is nothing but a tactic to evade section 16(b), as, for example, if an insider acquires a holding company that has no appreciable assets other than shares of the issuer, or that holds a certain proportion of its assets in the stock of the issuer. However, we do not consider such pass-through transactions. We conclude that section 16(b) generally does not take account of transactions in which an insider's acquisition of an enterprise holding the issuer's stock entails appreciable risks and opportunities independent of the risks and opportunities that inhere in the stock of the issuer.

We therefore reject At Home's effort to treat Comcast's cable system acquisitions as section 16(b) purchases. Since At Home has alleged no other purchase to match Comcast's March 28, 2000 sale of At Home stock, the claim against Comcast fails, and was properly dismissed by the district court.

## CONCLUSION

We have considered the parties' remaining arguments and find each of them to be without merit. For the foregoing reasons, the judgment of the district court is affirmed.